IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KAWHI LEONARD,                    )
                                  )
          Plaintiff,              )   Case No. 3:19-cv-01586-MO
                                  )
     v.                           )
                                  )
NIKE, INC.,                       )   April 22, 2020
                                  )
          Defendant.              )   Portland, Oregon
_____   )

**Telephone Oral Argument**

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL W. MOSMAN

UNITED STATES DISTRICT COURT JUDGE

```
 1

 2                            APPEARANCES

 3

 4   FOR THE PLAINTIFF:      Mr. Peter R. Ginsberg
                            Mr. Mitchell C. Stein
 5                          Mr. Christopher Shields
                            Sullivan & Worcester LLP
 6                          1633 Broadway, 32nd Floor
                            New York, NY  10019
 7

 8                          Ms. Katherine M. Acosta
                            Mr. Matthew A. Levin
 9                          Markowitz Herbold PC
                            1455 S.W. Broadway, Suite 1900
10                          Portland, OR 97201

11

12   FOR THE DEFENDANT:      Ms. Tamar Duvdevani
                            Mr. Matthew Ganas
13                          DLA Piper LLP
                            1251 Avenue of the Americas
14                          New York, NY 10020-1104

15

16                          Mr. B. John Casey
                            Stoel Rives LLP
17                          760 S.W. Ninth Avenue, Suite 3000
                            Portland, OR 97205
18

19   ALSO PRESENT:          Mr. Jack Schecter

20

21   COURT REPORTER:        Bonita J. Shumway, CSR, RMR, CRR

22                          United States District Courthouse
                            1000 S.W. Third Ave., Room 301
23                          Portland, OR  97204
                            (503) 326-8188
24

25
```

(P R O C E E D I N G S)

(April 22, 2020; 9:39 a.m.)

* * * * * * * * *

THE CLERK:  Good morning, counsel.  I'm going to do a roll call first.

Who do I have present for plaintiff?

MR. GINSBERG:  Good morning.  This is Peter Ginsberg on behalf of Mr. Leonard.

MR. STEIN:  And Mitchell Stein on behalf of Mr. Leonard as well.

MS. ACOSTA:  You also have Katherine Acosta and Matt Levin on behalf of Mr. Leonard.

MR. SHIELDS:  And you have Christopher Shields, Sullivan & Worcester, also on behalf of Mr. Leonard.

MS. DUVDEVANI:  Good morning.  This is Tamar Duvdevani from DLA Piper on behalf of Nike.

MR. GANAS:  Good morning.  This is Matt Ganas, also of DLA Piper, on behalf of Nike.

MR. CASEY:  Good morning.  This is John Casey of Stoel Rives on behalf of Nike as well.

MS. DUVDEVANI:  And we also wanted to let you know Jack Schecter, the assistant GC for global IP litigation for Nike, in-house counsel, is on the phone as well.

MR. SCHECTER:  Good morning.

THE CLERK:  How does Jack spell his last name?

1        MR. SCHECTER:  It's S-c-h-e-c-t-e-r.

2        THE CLERK:  This is the time and place set for a

3   telephone oral argument in Case No. 3:19-cv-1586-MO, Leonard

4   versus Nike, Inc.

5        We do have a court reporter recording these

6   proceedings, so we ask that if you are not speaking, please

7   mute your phone.  If you do speak, please identify yourself for

8   the record.

9        And here is Judge Mosman.

10       THE COURT:  Thank you all for your willingness to

11  participate in this hearing by telephone in this era of no live

12  court proceedings.  It does require a different sort of skill

13  set, and so I will ask you -- and I'll try to do the same -- to

14  pause after you make certain points to allow me to interject if

15  I have a question.  All phone systems, mine included, sort of

16  ignores whoever tries to interrupt someone else, so you won't

17  hear me unless you take a breath now and then.

18       What I'd like to do is to start out with my own

19  tentative thoughts.  They are just that.  I'm not intending to

20  make rulings and then hear arguments.  I'm making tentative

21  thoughts, and then I'll hear you out, and then we'll decide

22  where this case goes at the conclusion.  So permit me, please,

23  to just take a couple minutes here to lay out brief tentative

24  thoughts.

25       I'm starting with the principal motion in the case,

not the affirmative defenses, (telephonic interruption) Nike's motion for judgment on the pleadings.

I'm going to pause here for a moment because it sounds like someone just joined us. Do we have a brand-new participant on the phone call right now?

(No response.)

THE COURT: All right. Thank you.

So as to the facts in the light relevant to the motion here today, it appears accepted that at least as early as his college years, Kawhi Leonard had an idea of incorporating his initials and the number 2 onto the shape of his hand, and that at some point, for purposes of our motion, I'm going to accept (telephonic interruption) prior to his entering into a contract with Nike, Mr. Leonard came up with what I'll call the Leonard sketch.

I'll just digress here for a moment. I'm going to refer to the Leonard sketch and the claw design as the two operative potential pieces of intellectual property here. And Mr. Leonard's counsel's use of the phrase or the term "Leonard's logo" I find not particularly helpful since it conflates the two and assumes certain legal rulings I haven't made yet.

So I will agree, though, that there is existence, and I'll say for today's purposes, prior to entering into any contract with Nike, of the Leonard sketch.

1          After being drafted, Mr. Leonard entered into a

2     sponsorship and endorsement contract with Nike in December of

3     2011, which I assume he got paid.  He -- that is,

4     Mr. Leonard -- shared the Nike sketch and entered into an

5     iterative process with the Nike design team, and together they

6     came up with what I now call the claw design.  Nike got a

7     copyright on this claw design in May of 2017, and Mr. Leonard

8     got a copyright on the same design in June of 2019.

9          I believe the first issue, an important issue that

10    runs through most of the legal arguments here is who owns the

11    claw design.  And there are both contractual and copyright

12    issues to answer this question.  I will say the contractual

13    language here is very broadly written, and I'll note again by

14    way of brief digression that I believe the contract itself is

15    suitable for consideration at this stage of the proceeding, and

16    specifically referenced in the complaint and control, and for

17    what it may be worth, similarly I can consider at this stage of

18    the proceeding both the Leonard sketch and the Leonard and Nike

19    copyright.

20         But I want to think about this in terms of, for

21    starters, two hypothetical ends of a continuum, so not our

22    facts, two hypotheses that present extremes, and our case will

23    be in the middle.  The first is to say, well, what if there had

24    never been any Leonard sketch, just a creative process with the

25    Nike design team, even one in which Mr. Leonard has the

1 original idea of doing something with his hand, his initials,

2 and a number, and then the design team and Mr. Leonard come up

3 all post contract with the Nike -- with the claw design, which

4 Nike then copyrights.  So for my purposes at this first end of

5 this continuum, that as a matter of both contract and copyright

6 law would result in Nike owning the claw design.

7 　　　　　The second or other end of the continuum -- again,

8 just a hypothetical -- Kawhi Leonard has not the sketch but the

9 claw design before the Nike contract and brings that claw

10 design with him, that preexisting claw design with him into the

11 relationship with Nike and the contract, and Nike merely

12 incorporates the claw design and puts it on Nike clothing.

13 Probably under the contract and probably under copyright law,

14 that would be a piece of intellectual property in which

15 Mr. Leonard has an interest and which Nike would not.

16 　　　　　I use those two ends of the continuum simply to

17 illustrate that a critical issue for our case then is whether

18 the claw design is a separate product or a separate piece of

19 intellectual property from the Leonard sketch, as Nike asserts,

20 or whether they are fundamentally the same thing, what

21 Mr. Leonard calls the Leonard logo, whether there's just one

22 piece of intellectual property in play here.

23 　　　　　If that's the question, then the next question is

24 what's the methodology for answering whether there are one or

25 two pieces of intellectual property here, whether the claw

design is a separate piece of intellectual property from the Leonard sketch.

Mr. Leonard suggests that the Leonard sketch has protectable elements in it that are extrinsically similar to the claw design, that therefore the Court must leave the determination of these similarities and differences to the fact finder.

My problem with that is that that is the methodology for resolving a dispute between two separate copyrights. If I had in front of me a dispute between a copyright on the Leonard sketch and a copyright on the claw design, then that's probably the process I'd use, the methodology I'd use to answer that question. But that's not the question in front of me, not our case. There may some day be such a case, but not today. So in my view, looking for similarities isn't the issue.

Nike suggests the question is is the claw design a distinct piece of intellectual property from the sketch, and so instead of looking for common elements, I should look for material differences that make the claw design copyrightable independent of the sketch.

And, again, my tentative view is I think I agree, and that I also agree that it's a task that can properly be performed at this stage of the litigation. If those are both true, then I think I also agree that even in the light favoring plaintiff, the claw design is an independent piece of

1   intellectual property distinct from the sketch in several

2   obvious and meaningful ways, and that probably ends the

3   analysis on this motion -- not on the affirmative defenses but

4   for this motion.

5          For what it's worth, I'd say that I'm not really

6   interested in hearing much argument on the ambiguity of the

7   contract -- see *Hoffman* -- and I also agree that some of the

8   attempts to reform or alter the contract from its written state

9   run afoul of the obvious application of the parol evidence

10  rule.

11         So if those tentatives thoughts are correct, then

12  Nike owns the copyright on the design because it is

13  copyrightable distinct from the sketch, and therefore also owns

14  the design under the contract for similar reasons.

15         I'd like to pause there before I get to any

16  affirmative defenses.  My tentative rulings have run against

17  Mr. Leonard, so even though it's Nike's motion, I'll start with

18  the arguments you might want to make, in light of what I've

19  said, on behalf of Mr. Leonard.

20         MR. GINSBERG:  Thank you, Your Honor.  May it please

21  the Court, this is Peter Ginsberg.

22         Your Honor, when Judge Bashant transferred the case,

23  her tentative ruling was that the seminal issue is whether this

24  design does or does not fall under the agreement, and also

25  recognized that there are well-crafted pleadings proffered by

1  Mr. Leonard that he created the design before, the design

2  didn't arise under the agreement, and during this iteration

3  process that Your Honor discussed, there was a specific

4  agreement between Nike and Mr. Leonard that the logo which Your

5  Honor has referred to as the claw did not fall within the

6  contract, and that Mr. Leonard had created the claw, that

7  Mr. Leonard had granted permission to Nike to use it.

8        And I think it would be helpful, Your Honor, if we go

9  through the pleadings and the allegations, all of which,

10  respectfully, Your Honor must accept as true.

11        It wasn't simply, as Your Honor stated, that

12  Mr. Leonard created an idea.  Paragraph 1 of the complaint

13  makes clear that in 2001, Mr. Leonard authored a unique logo

14  with meaningful elements unique to him, comprised of his large

15  hands and his initials and his number, and that that design,

16  that creation was in existence not only in 2011, but had been

17  in the works before that, and so it predated the Nike contract.

18        THE COURT:  Can I pause you there for just a moment.

19  I appreciate the pleadings on this score, and I certainly

20  accept that the pleadings assert -- and I must accept as

21  true -- that Mr. Leonard had something by way of an idea and a

22  sketch before he entered the contract.

23        Does your argument depend on there being no

24  non-trivial or material differences between the sketch and the

25  ultimate claw design or not?

1          MR. GINSBERG:  No, Your Honor.  And I think that's

2     why it's so important for us to look specifically at the

3     allegations.  The pleadings make clear it was not until 2014

4     that Nike agreed with Mr. Leonard that there would be a unique

5     design for him.  And Nike has multiple sponsors and endorsers,

6     but it's unusual for a person to have a unique design.  During

7     the three years between the execution of the contract and this

8     determination in 2014 to create a unique design, Mr. Leonard

9     continued to work on this design and continued to modify it,

10    and when Nike in 2014 determined that it was going to create a

11    unique design for Mr. Leonard, it proposed multiple designs.

12    It proposed crowns and other types of designs that Mr. Leonard,

13    one after another, refused, he rejected, which was his right.

14    Paragraphs 24 -- 23 and 24 and 25 make that clear.

15          As Mr. Leonard was going through the process of

16    rejecting one after another of the Nike designs created under

17    and arising out of the contract, he then engaged in

18    communications with Nike.  He convinced Nike that Nike should

19    use his logo and his design.  He proposed that the KL2 claw

20    would be used.  And Nike wanted to please Mr. Leonard -- and

21    this is all provided in the complaint, paragraphs 26 and 27.

22    Nike reviewed the logo and worked with Mr. Leonard because

23    there were certain modifications that had to be made to make it

24    marketable.

25          Mr. Leonard accepted, in June 2014, when these minor

1  modifications were made -- paragraph 29 of the complaint -- and

2  specifically granted to Nike permission to use that claw.  Not

3  only did he grant permission to use the claw, but Your Honor

4  should know that this claw was being used during this iteration

5  process and thereafter on non-Nike products as well.  And

6  that's important and also specifically alleged in the

7  complaint.  And when Mr. Leonard agreed to allow Nike to use

8  the claw, Nike representatives confirmed that Mr. Leonard would

9  continue to own this claw.  They confirmed and Mr. Leonard made

10  explicit that it would be used both on Nike product and on

11  non-Nike product.  That's what happened during the continuum of

12  the contract.  Nike was well aware that it was being used on

13  non-Nike product, and Nike was well aware, and Mr. Leonard's

14  representatives confirmed and Nike representatives confirmed

15  that Mr. Leonard continued to own what Your Honor has described

16  as the claw.  Paragraphs 31 and 32 of the complaint.

17          THE COURT:  Can I pause you there again.

18          MR. GINSBERG:  Sure.

19          THE COURT:  So it's important to use the right terms

20  in the right places.  You're asserting now that Nike agreed

21  with Mr. Leonard that he owned the claw.  The complaint doesn't

22  say that.  The complaint says that Leonard's representatives

23  confirmed that Leonard continued to own the Leonard logo.  At

24  Nike's paragraph 33, Nike representatives recognized Leonard's

25  right to the Leonard logo.

1    So I'm not sure what the complaint means by "logo,"

2  and I'm not sure what you mean by what Mr. Leonard brought into

3  the relationship.  Are you referring to something other than

4  the sketch, and what do you mean by logo?

5    MR. GINSBERG:  Sure.  I appreciate that, Judge.

6  Thank you for allowing me to clarifying that.

7    When he referred to the Leonard logo, and especially

8  as of June 2014, when Mr. Leonard agreed to give permission to

9  Nike to use the -- what we call the Leonard logo, that quite

10 clearly from the complaint, Your Honor, refers to what Your

11 Honor has described as the claw.  And from 2011 through 2014,

12 Mr. Leonard, as alleged specifically in the complaint, had the

13 sketch created in 2011 and continued to make ongoing

14 modifications of it.

15   So I can't tell you -- I can't tell you specifically

16 sitting here, and I don't think Your Honor can make a

17 determination when it was that Mr. Leonard first gave over to

18 Nike to consider for its use whether -- whether it was

19 something beyond the sketch that was created during those three

20 years.  But when we refer to Mr. Leonard specifically giving

21 permission to Nike to use what we refer to as the Leonard logo,

22 it is what Your Honor refers to as the claw.

23   THE COURT:  That's the main question I guess I'm

24 struggling with with regards to the complaint.  It describes

25 Mr. Leonard in December of 2011 or maybe January of 2012 as

creating the Leonard logo, and then refers to everything that
happens thereafter as the Leonard logo.

I guess the complaint forces one, if you accept it as
such, to accept the conclusion that whatever Mr. Leonard had in
2011 is the same thing that came out of the iterative process
with the Nike design team.

Is that --

MR. GINSBERG:  Your Honor --

THE COURT:  Is that a conclusion that has to be
accepted from the complaint at this stage of the game?

MR. GINSBERG:  No, because the complaint alleges that
Mr. Leonard continued to modify that sketch after 2011 as well.

If what Your Honor needs is a redrafting of the
complaint so it's clear that as of June 2014, what Nike gave --
what Mr. Leonard gave permission to Nike to use is what Your
Honor has referred to as the claw, that's a simple drafting --
a drafting issue.  Nike has modified Mr. Leonard's creation.
Nike modified this sketch, plus the modifications that
Mr. Leonard had made.

THE COURT:  Well, the problem with your argument so
far in terms of clarity is that you're asserting that Nike
recognized that Mr. Leonard owned the logo, by which I
understand you to be saying that Nike told Mr. Leonard he owned
the claw design.

MR. GINSBERG:  Exactly.  That's exactly right, Your

1  Honor, that in June of 2014, when what Your Honor has

2  identified as the claw was agreed to, paragraph 29 in the

3  complaint, and that's the logo used on Nike product and

4  continued to be used on non-Nike product.

5        June 2014, when we allege that Mr. Leonard granted

6  permission to Nike to use that logo, we specifically say it was

7  to affix that logo on Nike product, on Nike merchandise.

8        So I -- respectfully, I don't think there is much

9  ambiguity there.  I think it's clear that whether there are one

10  or two different logos, what happened in June of 2014 was the

11  logo for which Mr. Leonard gave Nike permission to affix to

12  Nike merchandise is what Your Honor has identified as the claw,

13  and as in paragraph 31, as of that time, not only did

14  Mr. Leonard's representatives have communications with Nike,

15  making it clear that Mr. Leonard -- or confirming that

16  Mr. Leonard owned what Your Honor has referred to as the claw,

17  and making it clear that he did not transfer those rights,

18  that -- paragraph 32, Nike representatives agreed that the logo

19  that would be affixed to Nike merchandise would belong to

20  Mr. Leonard.  And the conduct of the parties after that is

21  consistent with that agreement.  If it were a Nike-owned logo,

22  Mr. Leonard would not have been able to use, under the terms of

23  the agreement, Mr. Leonard would not have been able to use the

24  claw on non-Nike product, but he did.

25        THE COURT:  What do you make of the application of

1  the parol evidence rule to the discussions and permissions

2  you're now alleging?

3          MR. GINSBERG:  Judge, respectfully, I think that

4  relying in connection with the contract language is inherently

5  ambiguous.  Just like the court -- the Ninth Circuit found in

6  *Mattel*, the language about "at any time during my employment"

7  is inherently ambiguous.  So I think it's perfectly acceptable

8  to use the parol evidence rule and consider the parties'

9  communications, representations, agreements, as well as the

10 parties' conduct to make a determination as to these facts.

11         THE COURT:  Assume that for the moment that I

12 disagree that the language is ambiguous.  Then what do you make

13 of the application of the parol evidence rule?

14         MR. GINSBERG:  Well, I think even if Your Honor

15 decided it was ambiguous, that doesn't preclude Your Honor from

16 making a determination that the parties' representations can be

17 considered to determine the parties' understandings about

18 whether this was or was not in connection with the contract.

19         THE COURT:  Well, that's exactly what finding it

20 unambiguous would prevent.  So assume that I don't look to

21 these other conversations to decide the meaning of the term,

22 and therefore the term is unambiguous and applied as written.

23 Then wouldn't the parol evidence rule prevent reformation of

24 the contract through these contemporaneous discussions you're

25 referring to?

1    MR. GINSBERG:  With respect, I don't think so, Your

2  Honor.  I think that even if unambiguous -- even if

3  unambiguous, that doesn't involve this situation where the

4  parties' conduct -- the parties' conduct is inconsistent with I

5  think what Your Honor is suggesting might be the language of

6  the contract.  Your Honor can take that into consideration in

7  understanding this situation.

8    THE COURT:  I can certainly take it into

9  consideration to think about concepts like estoppel or waiver,

10  but I guess, you know, my hornbook memory of the parol evidence

11  rule is that it would precisely prevent exactly this sort of

12  contemporaneous contrary discussions being used to reform the

13  terms of the contract.  Am I wrong about that?

14    MR. GINSBERG:  That's what sort of a black letter

15  parol evidence rule is.  With respect, I think that -- first of

16  all, I don't think "in connection with" can be deemed to be

17  unambiguous.  I understand Your Honor's leaning in that

18  direction, but I think for the Court to ignore the allegations,

19  ignore the communications, and ignore the -- ignore the

20  conduct, I think that is -- I think that wouldn't be proper.

21    Your Honor is correct as to the parol evidence rule,

22  but the contract language doesn't apply to this situation.

23  This wasn't something that was created in connection with the

24  agreement.  This was something that was created before the

25  agreement, and the parties thereafter, when they couldn't come

1  to an understanding, when they couldn't come to an agreement as

2  to what logo was used, went outside the contract and used

3  something that Mr. Leonard created.

4  THE COURT:  I agree that Mr. Leonard could bring into

5  the contract something that's preexisting and that would not be

6  covered by the contract.  I agree with the idea that if

7  Mr. Leonard had a sketch prior to the contract, that the

8  subsequent use of the sketch one way or the other would not

9  necessarily be covered by the contract.  But that depends,

10  doesn't it, on what eventually comes out of the Nike design

11  team and Mr. Leonard's joint efforts to be not something

12  materially different from whatever Mr. Leonard had before he

13  entered into the contract.  If he brings -- if he brings

14  something into the contract and then works with Nike to create

15  something new, in my view, that's covered by the contract.  If

16  nothing new is created, then the fact that Mr. Leonard had it

17  before the contract was ever entered into takes it and keeps it

18  outside the contract.

19  What's wrong with that?

20  MR. GINSBERG:  Well, that's exactly -- that's exactly

21  what happens here.  In 2011, there was a sketch, and Your Honor

22  has that.  Then between 2011 and 2014, when Nike decided it was

23  going to use a unique logo or a unique mark for Mr. Leonard,

24  Mr. Leonard continued to modify that.  And the only way Your

25  Honor can determine what the modifications by Mr. Leonard were

between 2011 and 2014 is going to hear the evidence and
ultimately for the finders of fact to determine whether there
are similarities between Mr. Leonard's creation as of 2014 and
what ultimately was affixed.

THE COURT:  All right.  Let me pause you there for
just a moment because that's an important point I want to try
to discuss with you.

My tentative views, as I said at the outset, is that
there are significant differences between the Leonard sketch
and the claw design.  What you're suggesting is that
Mr. Leonard, independent of the Nike design team, modified his
own sketch and then gave something very similar to what
ultimately looked like the claw design to the Nike design team.
That's all before the iterative process begins, and so
therefore what I really ought to be thinking about is are there
any big differences between what Nike -- excuse me, what
Mr. Leonard eventually gave to Nike sometime in 2014 and what
the Nike design team and Mr. Leonard ended up with, rather than
just look at differences between the sketch and the claw
design.  Is that right?

MR. GINSBERG:  That is exactly right, Your Honor, and
that is what is alleged in the complaint.  And what Nike did --
and also alleged in the complaint -- is it simply modified what
Mr. Leonard presented to Nike.

THE COURT:  Thank you very much.

1           I'll now turn to Nike for its response.

2           MS. DUVDEVANI:  Thank you, Your Honor.  This is Tamar

3 Duvdevani on behalf of Nike.

4           Did you want me to start with the issue relating to

5 ambiguity or should I just jump in where we just left off?

6           THE COURT:  We don't need to discuss ambiguity.

7           MS. DUVDEVANI:  Okay.  Your Honor, Nike's view is

8 that the allegations and that both of Mr. Leonard's affirmative

9 allegations as put in his complaint and his admissions in his

10 response to Nike's counterclaims conclusively establish that

11 the two designs at issue here are the Leonard sketch and the

12 claw design.  And we believe that those pleadings are

13 conclusive.

14           In particular, plaintiff pleads that he prepared the

15 Leonard logo -- I'm going to use your vernacular, Your Honor.

16 That he prepared the Leonard sketch in December of 2011 or

17 January of 2012, that he forwarded to Nike --

18           THE COURT:  I'm going to pause you there for just a

19 moment, because I need to ask what you -- obviously at this

20 procedural posture in the case, what I'm supposed to make of

21 the complaint's reference to the Leonard logo, for example, in

22 paragraph 33.  What's meant by that?  I can't just say I know

23 what it means and grant you a victory.

24           MS. DUVDEVANI:  No, but I think if you look at

25 Mr. Leonard's response to Nike's counterclaim, he admits that

the sketch that Leonard -- that Nike put before the Court is
the -- is the sketch that he's referring to that he created in
2011.  He certainly never argues in his opposition brief that
there were different sketches that he provided to Nike.  The
only allegation is that he -- that he forwarded to Nike the
Leonard logo in connection with Nike's discussions with Leonard
about creating a unique logo, and those are his allegations at
paragraph 23 and 25.

He then alleges that Nike modified the sketch or
modified the Leonard logo, and that Nike submitted to Leonard
several design proposals based on the sketch between spring and
summer of 2014.  He alleges in paragraph 29 that he accepted
one of those proposals, and he specifically uses the words
"based upon the Leonard logo," but not the so-called Leonard
logo itself, which is where we can very clearly see that
putting aside the conflated vernacular, there really are two
different images here.

He also alleges that the accepted design was affixed
on Nike merchandise during the term of the contract, obviously
created in connection with the contract.  He also admits that
he signed the agreement which was in effect during that entire
time, that he sent to Nike the sketch during the contract term,
and that Nike, followed by plaintiff, both obtained copyright
registrations in the claw design.  In other words, that the
claw design, while not depicted in his pleading, is the work he

1  seeks the declaration of ownership over right now.  And that's

2  counterclaim answer 41.

3         So Nike's view is that those pleadings, plaintiff's

4  pleadings show there is no dispute that what the plaintiff

5  calls in his complaint the modified Leonard logo is what Nike

6  calls the claw design that the parties used in connection with

7  their contract and that both parties registered with the

8  Copyright Office, but that what plaintiff calls the Leonard

9  logo is the rough sketch that plaintiff claims to have drawn

10  sometime in 2011.

11         And I'll also point out, Your Honor, that if you look

12  at the very first allegation that Leonard makes in paragraph 1

13  of his complaint, where he says, "Leonard traced his notably

14  large hand, and inside the hand drew stylized versions of his

15  initials KL and the number that he had worn for much of his

16  career, 2," that depiction is certainly consistent with the

17  image that Nike put forward in front of the Court and that

18  Leonard admitted was what he provided to Nike.

19         There is just no argument in the opposition that

20  there are some other modified images that Leonard gave to Nike

21  that were independently produced.  This is the first time that

22  I'm hearing this today.  However, Your Honor, even if that were

23  true, based on the language of paragraph 8 of the agreement,

24  those modified images would still belong to Nike because they

25  are being created in connection with the contract.  And

paragraph 8 makes it very clear that Nike owns copyrights not just created by it in connection with the contract but created by Mr. Leonard as well.

THE COURT:  You agree that a principal question here is whether the claw design is a distinct piece of intellectual property from the sketch, correct?

MS. DUVDEVANI:  I do agree with that, Your Honor, and I do believe that that answer is readily found within copyright law.

THE COURT:  I'll come to that in a moment.

So I guess you agree and also accept the complaint's assertion that Nike has, in fact, told Mr. Leonard that he maintains whatever intellectual property rights he had in the sketch, right, even after entering into the contract?

MS. DUVDEVANI:  I -- for the purposes of our motion, Your Honor, we are accepting all of his allegations as true, but as Your Honor already pointed out, the parol evidence rule conclusively bars those allegations from being relevant to the issues at hand.

THE COURT:  So at least being relevant to the issue of contract formation, right?

MS. DUVDEVANI:  Contract formation interpretation, yes, Your Honor.

THE COURT:  It could be relevant to issues like estoppel or waiver or such, correct?

1          MS. DUVDEVANI:  It could be relevant to issues of

2    estoppel or waiver, and if we have a chance to speak about

3    affirmative defenses and why those wouldn't (telephonic

4    interference) Nike's motion at a later point during the call,

5    or I can address that right now.

6          THE COURT:  I'll come to that in a moment.

7          So, finally, if the question is whether the claw

8    design is a distinct piece of intellectual property in some way

9    from the sketch, then by what methodology -- I know your

10   answer, but by what methodology does the law counsel me to

11   decide that question?  What's the test?

12         MS. DUVDEVANI:  Sure.  So there's a couple different

13   issues with regard to derivative works that are in the

14   pleadings.  And I think it gets a little bit confusing.

15         So to take a step back, I think that what we should

16   first keep in mind is the question of authorship, because what

17   I am hearing plaintiff's counsel say is that his client should

18   be considered the author of both works.  But the Copyright Act

19   and the related jurisprudence makes very clear that authorship

20   is more than mere directions and ideas, and that the author is

21   the person who really does put pen to paper to fix the work in

22   a tangible medium of expression.  And we see that in *Community*

23   *for Creative Non-violence v. Reid*, 490 U.S. 730, 1989, where

24   the Supreme Court says, "As a general rule, the author is the

25   party who actually creates the work, that is, the person who

translates an idea into a fixed, tangible expression entitled to copyright protection."  And that's recited also by the Ninth Circuit in *SOS, Inc. v. Payday*.

First and foremost, as long as we're willing to accept the fact that we are looking at two different images here, it is clear from the allegations in plaintiff's pleadings that he did not do more than provide mere direction and ideas, that it was Nike's designers that put pen to paper to fix the work in a tangible medium of expression.

Now, when we talk about whether or not the claw design should be considered a derivative work of the Leonard logo, that is actually a slightly different issue than what was briefed, although we did touch upon that in our reply brief. At the end of the day, to be considered a derivative work is different in its analysis as to whether or not a derivative work should get separate copyright protection under the Copyright Act, and those are two very important distinctions.

If Leonard is now putting aside the position that the Leonard logo is one and the same, and he's acknowledging that there are two distinct images, and making an argument that the claw design is a derivative of the sketch -- again putting aside the fact that that derivative would still have been authorized by the terms of the agreement he entered into -- the test to determine if that really is an unauthorized derivative work is the exact same test that Your Honor used in *Rentmeester*

1 to determine copyright infringement; that is, substantial

2 similarity.  The Ninth Circuit has made that clear under the

3 case that we cited, *Smith v. Weeknd*.  The Central District of

4 California has acknowledged that as well -- or rather, I

5 apologize.  *Sobhani* has acknowledged that as well, that the

6 test to determine whether or not something is a derivative work

7 is really the substantial similarity test.  And as Your Honor

8 knows from having done it two years ago, you can readily do

9 that.

10      If we're talking about the separate issue as to

11 whether or not a derivative work should get a different scope

12 or a separate copyright protection from an underlying work, to

13 the extent that work was authorized, that's where we get into

14 the two-part Durham test that Nike partially cited in its

15 brief, and that Leonard largely attacked Nike for not

16 discussing the second prong.  That's a very different analysis

17 and a very different factual circumstance, and it typically

18 arises where an authorized creator of a derivative work wants

19 to go after other authorized creators of derivative works for

20 the same underlying work for copyright infringement.

21      And what the copyright law says about that is look,

22 it has to be non-trivial differences because otherwise that

23 derivative author is essentially going to gain a monopoly over

24 their copyrighted work.  And we see this in both the *DC Comics*

25 case and the costume case, which I believe is one of the Ninth

Circuit cases that was relied upon by Leonard.  I'll find it in
a moment.

But generally speaking, that case related to the fact
that there was an underlying copyright in characters as there
was an authorized licensee that made costumes.  He sued another
licensee for copyright infringement that also was making
costumes of those characters, and the Ninth Circuit explains
that because he didn't really add anything sufficiently
original or protectable, he wasn't entitled to a second
copyright for that derivative work because in essence he then
was about to be given a monopoly over all costumes of those
characters.

That is not what we're dealing with here.  So really
the issue is Leonard now wants to somehow amend his pleadings
to claim that Nike is engaged in copyright infringement as a
result of an unauthorized derivative work.  And, again, putting
aside the language of the contract, all we would need to look
at is substantial similarity.

THE COURT:  And you have briefed why you think that
question could be answered even at this stage of the
proceedings.  Do you want to add anything to why you think I
can make a substantial similarity determination between the
sketch and the claw design beyond what you've briefed?

MS. DUVDEVANI:  We didn't go deeply into it, Your
Honor, because there were a lot of different issues, but

generally speaking, I would just follow the dictates of your

*Rentmeester* decision and the Ninth Circuit's affirmance in

applying the extrinsic test, pulling out the unprotectable

elements, which is the idea of a logo incorporating a hand, a

K, and an L, and a 2, seeing what's left, and seeing if Your

Honor can make an objective determination on whether what's

left is substantially similar.  I think it was also a much

closer call in *Rentmeester* than it is here.

THE COURT:  You think the protectable elements are

the hand, the initials, and the letter 2?

MS. DUVDEVANI:  Excuse me?

THE COURT:  You think the protectable elements are

the initials and the number 2 imposed on a hand?

MS. DUVDEVANI:  I think those are the unprotectable

ideas, and that once Your Honor pulled out those unprotectable

ideas, everything that's left is not substantially similar.

What Leonard has that he has protectable in the

Leonard sketch -- and I acknowledge that the Leonard sketch is

a protectable work of art.  The minimum threshold for

creativity under the Copyright Act is very low, so, you know,

if I drew a flower on the (indiscernible) right now, Your

Honor, I would have a copyright in it, right?

But what I am saying is what Leonard has as a

copyrightable protectable expression in the Leonard sketch is

the actual sketch itself, the way the hand looks, the way the K

1    is drawn, the way the K and the L are combined, where the 2 is,

2    et cetera, but he himself has really expressed this as an idea

3    which is a logo incorporating his hands, a K, an L, and a 2.

4    That is an idea that is not protectable, the same way that

5    Michael Jordan making a grand jete on a basketball court is not

6    a protectable element either.  It's an unprotectable idea.  And

7    for Mr. Leonard to receive protectable status of those elements

8    essentially means that he would have a monopoly on every single

9    logo of a hand with a K and an L and a 2.  That cannot be the

10   case under copyright law.

11            THE COURT:  Thank you very much.

12            For Mr. Leonard, do you wish to reply to that

13   argument briefly?

14            MR. GINSBERG:  Yes, Your Honor.

15            I'd like to have Mr. Stein deal with the more

16   technical intellectual property analysis.

17            I do want to say one thing, that counsel's argument

18   continues to ignore the activities as alleged between 2011 and

19   2014, and the specific allegation that what was affixed to Nike

20   items was simply a modification of what Mr. Leonard provided to

21   Nike and specifically granted permission to that logo that Your

22   Honor is referring to as the claw.

23            I would like Mr. Stein to address the extrinsic test

24   and the other intellectual property issues that were just

25   raised.

1    MS. DUVDEVANI:  Can I respond to that, Your Honor?

2    THE COURT:  You'll get a moment.  Thank you.

3    MS. DUVDEVANI:  Okay.

4    THE COURT:  But not right now.

5    MS. DUVDEVANI:  Okay.

6    THE COURT:  For Mr. Leonard first.

7    MR. STEIN:  Your Honor, this is Mitchell Stein from

8    Sullivan.  I'll keep it very brief.

9    With respect to the derivative work analysis, we're

10   arguing -- and this is the source of the confusion, I think.

11   We've been arguing all along that the Leonard logo, from the

12   sketch through the final product, was one and the same, that

13   the modifications were not of the type that would rise to

14   create a derivative work.  We are not claiming ownership of a

15   derivative work, we're claiming ownership of the logo

16   Mr. Leonard created.

17   With respect to the extrinsic test, while my esteemed

18   co-counsel stated the basic principle correctly, the

19   application I actually take issue with.  What we have here is a

20   combination of elements which by themselves is protected by

21   copyright, and as admitted by co-counsel -- opposing counsel,

22   the KL2 combination, in combination with the hand, is not an

23   idea, it's an expression.  It's been reduced into a tangible

24   form.

25   When you apply the extrinsic test, you do extract

non-protectable elements, but once you're left with what those

protectable elements are, you look for objective similarities.

And even though there may be differences, if there are

objective similarities under the extrinsic test, the Court's

job is done and the matter then proceeds to further

determination under the intrinsic test, which is reserved for

the fact finder.

That's all.

THE COURT:  So let me make sure I follow.  Your main

argument isn't -- doesn't require analysis of derivative versus

non-derivative because you contend that the entire thing,

anything we're looking at here, up through and including all

but the most minor modifications to the claw design are

Mr. Leonard's work, but I'd like to ask you sort of

hypothetically, then, if I were to determine that what I had to

do was apply the substantial similarity test to the Leonard

sketch, as compared to the claw design, then you say that I'd

still come out in your client's favor because more of what is

involved is an expression by Mr. Leonard as opposed to the sort

of generic idea that was in play in *Rentmeester*, and that

therefore it would at least be left to the fact finder to

determine substantial similarity.  Is that right?

MR. STEIN:  That's correct, Your Honor.  *Rentmeester*

is a very different situation because there were photos and

there were many, many different elements which went into the

1  Court's consideration as to what was protectable and

2  non-protectable. And the one key similar element between the

3  photos was the position of Mr. Jordan in a grand jete, which

4  the Court ruled was not by itself protectable.

5        But that's not this case. The KL and the number 2

6  and the hand, as expressed by Mr. Leonard in his sketch, and as

7  modified, is the protectable element which appears in the Nike

8  claw, and based on that, that's the end of the extrinsic test

9  as we qualified.

10       THE COURT: You're saying that if I find, as between

11  the sketch and the claw design, a common protectable element,

12  that's enough to defeat the motion and send it to the fact

13  finder?

14       MR. STEIN: With respect to the substantial

15  similarity, yes. Obviously there's contract issues. But your

16  ability to analyze the similarities is proscribed by the Ninth

17  Circuit due to the extrinsic test.

18       THE COURT: All right. Thank you very much.

19       For Nike, do you wish to speak briefly, I understood?

20       MS. DUVDEVANI: Yes. And I do want to respond to

21  that, Your Honor, that the reason I -- and trust me, I think

22  that Nike won *Rentmeester*. Let me make sure I have that on the

23  record since my client is listening.

24       But the reason I believe that this is an even easier

25  case is because of precisely what Mr. Stein just said, which is

that there were many, many ways to create a photograph in
*Rentmeester*.  Here there are not many ways to create Leonard's
idea, which is a logo of a hand with a K and an L and a 2.  So
while this isn't really an apt place to discuss *Mattel*, it's
now been brought in, and what I'll say is because there aren't
a gazillion ways to make the Leonard logo or the Leonard sketch
or the idea that's proposed by the Leonard sketch, in order to
find substantial similarity, those two would need to be
virtually identical.  So by that own argument, that actually
would defeat the claim that the Court can't make these
determinations under the extrinsic test in order to find lack
of substantial similarity.

        The only issue that I wanted to go back really was
what was discussed with regard to ambiguity and when it can and
can't come in.  And just because there's a disagreement, I do
want to put on the record that not only can the Court look at
the terms of a contract on a Rule 12 motion and determine
copyright ownership.  And we saw that in *Warren v. Fox Family*
*Worldwide*, which was affirmed by the Ninth Circuit at 328 F.3d
1136.  The plaintiff there was trying to do the same thing.
And what the Court said is that the protestations do not
undermine the explicit and unambiguous contract that
establishes that the compositions were works made for hire.
And in trying to apply parol evidence, what the Court said is
that essentially what they're trying to do is not explain

1  ambiguities but rather contradict the terms of the agreement.

2      And that is exactly what we have here.  That's not

3  permitted by the parol evidence rule.  The parol evidence rule

4  is actually even more restrictive under Oregon law than it is

5  under California law, because -- and the Court of Appeals in

6  Oregon has made that clear.

7      And I'll just want to cite to you, Your Honor, one

8  more case, which is *Harris v. Warren Properties*, 207 Oregon App

9  732, 2006, citing the parol evidence rule and noting in a

10  footnote 3 that as the Court explained in the previous

11  decision, the parol evidence rule allows three express

12  exceptions for which a court may consider extrinsic evidence:

13  to establish an ambiguity based on circumstances surrounding

14  formation, to explain an ambiguity, or to show fraud or

15  illegality.

16      And while Leonard does couch his argument in the

17  language of ambiguity, we have yet to see what he is saying is

18  the alternate reasonable interpretation of the terms in

19  connection with.  When you really drill down on that argument,

20  what Leonard is actually not really saying -- he's not really

21  saying ambiguity, he's saying inapplicability.  And we see this

22  in his brief when he says that because the agreement doesn't

23  contemplate works that were conceived before the creation of

24  the contract or that were -- there was no transfer of ownership

25  of prior IP, that somehow that creates an ambiguity.  It

1  doesn't create an ambiguity.  And even if these allegations are

2  trying to support an ambiguity, all they do is contradict the

3  agreement, and they can't be considered under the parol

4  evidence rule.

5       THE COURT:  Thank you.  I'd like to follow up briefly

6  with you on another point.

7       We've walked down this path quite a distance by my

8  asking the question if the initial issue is who owns the claw

9  design, then by what test does one determine that ownership.

10  The parties have argued with me about the application of

11  copyright law to that question.  Is there a different test for

12  deciding under contract law, this contract, who owns the claw

13  design as a matter of contract?

14       And so I'll start by asking Nike, do you accept the

15  proposition that was contained in one of my earlier

16  hypotheticals, that if Mr. Leonard had some design fully

17  formulated that predated the contract, that entering into the

18  contract wouldn't necessarily transfer ownership of that

19  preexisting design to Nike?  Is that your position or not?

20       MS. DUVDEVANI:  I think that's a fair position, Your

21  Honor.  I mean, I think at the very least I might then want to

22  reexamine the contract and see if the created in connection

23  with would create an ambiguity in that circumstance.  But to be

24  fair, sitting here today, yes, I am inclined to agree with your

25  hypothetical.

1    THE COURT:  And so that hypothetical would depend on

2    the claw design having what I call non-trivial differences

3    between it and the sketch, right?

4    MS. DUVDEVANI:  Yes, I think that's fair.

5    THE COURT:  But is there a particular test I would

6    apply to decide whether the claw design is different enough

7    from the sketch to come within the perimeter of the contract or

8    is it just that there are non-trivial differences?

9    MS. DUVDEVANI:  I'm sorry, my answer is twofold.  I

10   do think when it comes to deciding if a derivative work has a

11   separate scope of protection under the *Durham* test, and I think

12   the first part, I agree with you.  However, what we're really

13   looking at is whether or not the claw design was created in

14   connection with the contract in the first place.  And so long

15   as it is, and so long as we ignore the legal fallacy that two

16   discrete images can be one and the same for the purposes of

17   Leonard's allegations, then, you know, I would fall back on the

18   fact that the Court would look and note that there are not

19   non-trivial differences, there are a lot of differences between

20   the two drawings, and therefore one is not the same as the

21   other.

22   THE COURT:  I'm going to take another run at that.

23   My question is I think a relatively simple one but sort of hard

24   to separate from other questions.  So if I start hearing

25   copyright law, I'll know I've formulated the question badly.

1    I understand your argument about how I'm to tell the
2 difference for copyright law purposes between the --
3    MS. DUVDEVANI:  Oh, okay.
4    THE COURT:  -- sketch.  I'm now asking -- it's clear
5 to me that the parties are in agreement, Nike is in agreement
6 that there is -- that there is a way in which Mr. Leonard could
7 enter into this contract already owning a piece of intellectual
8 property and not breach the contract by doing things with it
9 unless somehow that previously owned piece of property -- here
10 the sketch -- comes within the parameters of the contract by
11 being altered significantly with the help of the Nike design
12 team.
13    If that didn't happen, the Nike design team never got
14 involved or if the changes were trivial, then I think it's sort
15 of hypothetically your position that we'd be in a different
16 ballgame.  So I'm simply asking, there's got to be enough
17 change between the sketch and the claw design for the contract
18 to kick in, otherwise it doesn't kick in.  And how much change
19 is that?  Is it simply -- is there a common sense idea that
20 it's got to be material changes not trivial ones for the
21 contract to kick in?
22    MS. DUVDEVANI:  I'm not going to say copyright, but
23 what I will say is that they are two separately authored works.
24 And going back to the contract and the contract alone, when
25 Your Honor looks at paragraph 8 and when you look at Leonard's

allegations that must be taken as true, it is very clear that what he is alleging is that the claw design was created in connection with the agreement.

THE COURT: All right. Thank you very much. I'm going to put you all on hold for a moment.

Counsel, let me make clear. I'm going to put you on hold for about ten minutes. So feel free to leave your phones. I won't get you back off hold for at least ten minutes.

MR. GINSBERG: Your Honor, can I address one comment that was just made?

THE COURT: No, thank you.

I'll put you on hold for ten minutes.

MR. GINSBERG: Thank you.

(A recess is then taken.)

THE CLERK: Good morning, counsel. Judge Mosman is back.

THE COURT: Do I have everyone here?

Can I hear from counsel for Mr. Leonard? Are you all here?

MR. GINSBERG: We are, Your Honor.

THE COURT: And for Nike, are you all here?

MS. DUVDEVANI: I am, Your Honor.

THE COURT: Thank you.

I appreciate the difficulty of these issues, and it's been helpful to hear from you in oral argument today.

1          Nike has moved for judgment on the pleadings that it

2    owns the claw design in its initial motion as a matter of

3    copyright law, and I grant that motion.

4          I repeat to some degree my analysis at the start of

5    this argument.  The parties' positions are important here.

6    Mr. Leonard's position throughout has been that there's

7    essentially one piece of intellectual property spreading above

8    this entire case, and that depends on a variety of reasons why

9    I shouldn't view the claw design and the sketch as anything

10   other than one continuous piece of intellectual property,

11   either because there aren't substantial differences between

12   them or because Mr. Leonard brought them in some form or

13   another predating the contract or for other reasons.

14          And Nike's contention throughout has been that there

15   are two pieces of intellectual property there, a sketch by

16   Mr. Leonard, and the claw design produced in connection with

17   the contract through an iterative process described as such in

18   the complaint itself.

19          And so as an initial matter, it is my finding that

20   there are, in fact, two pieces of intellectual property here,

21   two separate pieces.

22          Now, for contract purposes, as a threshold question,

23   the claw design would have to be new.  It would have to be

24   different enough in non-trivial ways to represent something new

25   from the sketch in order for the protections to Nike from the

1  contract to be invoked.  To state it in the opposite way, if

2  the claw design were simply something that Mr. Leonard had

3  created before the contract ever existed, then we'd be on

4  different footing with regard to the application of the

5  contract, but since I do find it to be new and materially

6  significantly different from the claw design, then I find that

7  it comes within the contract itself.  And that's important for

8  a variety of reasons.  It also -- one of which is that it gives

9  Nike the contractual right to seek copyright protection, which

10  it did, and which it did prior to any protection being sought

11  in such by Mr. Leonard.

12         Now, to get this far, I have to accept as correct

13  Nike's argument about how I ought to read the complaint with

14  regard to the complaint reference to the Leonard logo, and that

15  can only be parsed out meaningfully by looking at the complaint

16  itself and its timetable and the copyright petitions to some

17  degree, but more importantly the briefing on this score by

18  Mr. Leonard through his counsel.  And I therefore accept as an

19  accurate reading of the complaint that the Leonard logo refers,

20  depending which paragraph you're in, either to the Leonard

21  sketch or the claw design, and that they can be read

22  differently in different paragraphs of the complaint, and in

23  fact must be read in that way to make sense of the complaint.

24  And so I find that it is a new design, a new piece of

25  intellectual property covered by the contract.

1        Now, to some degree, even though that's fairly simple

2   that in the analysis, because for purposes of both contract and

3   copyright law, Mr. Leonard's position has been vehemently to

4   assert, even today in argument, that they are not staking out

5   the position that, for example, the claw design is a mere

6   derivative use of the sketch or something like that, and that I

7   ought to be looking at this as two pieces of intellectual

8   property that need to be compared to see whether the claw

9   design somehow failed the substantial similarity test or is

10  merely a derivative product of the sketch itself.  Instead,

11  Mr. Leonard's argument has been that there's just one, and

12  having made that argument, it sort of ends the analysis.

13       But I will go on to say that Nike asserts that it

14  wins as a matter of contract ownership a right to copyright.

15  In other words, that the claw design is copyrightable, but also

16  that it wins the substantial similarity analysis, and can make

17  a showing even at this procedural posture of the case that it's

18  not merely a derivative work of the sketch itself.

19       And I agree with that, without -- I should be

20  clear -- deciding some future case, the one that I don't have

21  in front of me, where I have actually two asserted pieces of

22  intellectual property, a copyrighted sketch and a copyrighted

23  claw design.  But for our purposes here today, I think Nike's

24  position is well taken under what I'll call the *Rentmeester*

25  analysis, and in any event, I'm not even sure how essential

that is, in light of plaintiff's position that there's simply one piece of intellectual property in play here, a position which I categorically reject.

I recognize there are on the table questions of affirmative defenses. I'm not going to hear from you today on those. I'll send out a very brief written opinion or minute order giving you my rulings on the affirmative defenses, but I grant Nike's motion for judgment on the pleadings as to ownership of the copyright in the claw design.

Thank you all. Good day.

MS. DUVDEVANI: Thank you, Your Honor.

(Proceedings concluded at 11:12 a.m.)

--oOo--

1

2

3

4          I certify, by signing below, that the foregoing is a

5   correct transcript of the record of proceedings in the

6   above-entitled cause.  A transcript without an original

7   signature or conformed signature is not certified.

8

9

10  _/s/Bonita J. Shumway_____          _April 25, 2020_____
    BONITA J. SHUMWAY, CSR, RMR, CRR        DATE
11  Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**MR. CASEY:** [1] 3/18

**MR. GANAS:** [1] 3/16

**MR. GINSBERG:** [18] 3/6 9/19 10/25 12/17 13/4 14/7 14/10 14/24 16/2 16/13 16/25 17/13 18/19 19/20 29/13 38/8 38/12 38/19

**MR. SCHECTER:** [2] 3/23 3/25

**MR. SHIELDS:** [1] 3/12

**MR. STEIN:** [4] 3/8 30/6 31/22 32/13

**MS. ACOSTA:** [1] 3/10

**MS. DUVDEVANI:** [24] 3/14 3/20 20/1 20/6 20/23 23/6 23/14 23/21 23/25 24/11 27/23 28/10 28/13 29/25 30/2 30/4 32/19 35/19 36/3 36/8 37/2 37/21 38/21 42/10

**THE CLERK:** [4]

3/2 3/24 4/1 38/14

**THE COURT:** [42] 4/9 5/6 10/17 12/16 12/18 13/22 14/8 14/19 15/24 16/10 16/18 17/7 18/3 19/4 19/24 20/5 20/17 23/3 23/9 23/19 23/23 24/5 27/18 28/8 28/11 29/10 30/1 30/3 30/5 31/8 32/9 32/17 35/4 35/25 36/4 36/21 37/3 38/3 38/10 38/16 38/20 38/22

**-**

--o0o [1] 43/2

**/**

/s/Bonita [1] 43/9

**1**

1000 [1] 2/22
10019 [1] 2/6
10020-1104 [1] 2/14
1104 [1] 2/14
1136 [1] 33/20
11:12 [1] 42/12
12 [1] 33/17
1251 [1] 2/13
1455 [1] 2/9

1633 [1] 2/6
1900 [1] 2/9
1989 [1] 24/23

**2**

2001 [1] 10/13
2006 [1] 34/9
2011 [14] 6/3 10/16 13/11 13/13 13/25 14/5 14/12 18/21 18/22 19/1 20/16 21/3 22/10 29/18
2012 [2] 13/25 20/17
2014 [16] 11/3 11/8 11/10 11/25 13/8 13/11 14/14 15/1 15/5 15/10 18/22 19/1 19/3 19/17 21/12 29/19
2017 [1] 6/7
2019 [1] 6/8
2020 [3] 1/6 3/2 43/9
207 [1] 34/8
22 [2] 1/6 3/2
23 [2] 11/14 21/8
24 [2] 11/14 11/14
25 [3] 11/14 21/8 43/9
26 [1] 11/21
27 [1] 11/21
29 [3] 12/1 15/2

**2**

29... [1] 21/12

**3**

3000 [1] 2/17
301 [1] 2/22
31 [2] 12/16 15/13
32 [2] 12/16 15/18
326-8188 [1] 2/23
328 [1] 33/19
32nd [1] 2/6
33 [2] 12/24 20/22
3:19-cv-01586-MO [1] 1/4
3:19-cv-1586-MO [1] 4/3

**4**

41 [1] 22/2
490 [1] 24/23

**5**

503 [1] 2/23

**7**

730 [1] 24/23
732 [1] 34/9
760 [1] 2/17

**8**

8188 [1] 2/23

**9**

97201 [1] 2/10

97204 [1] 2/23
97205 [1] 2/17
9:39 [1] 3/2

**A**

a.m [2] 3/2 42/12
ability [1] 32/16
able [2] 15/22 15/23
about [16] 6/20 16/6 16/17 17/9 17/13 19/15 21/7 24/2 25/10 26/10 26/21 27/11 35/10 37/1 38/7 40/13
above [2] 39/7 43/6
above-entitled [1] 43/6
accept [11] 5/13 10/10 10/20 10/20 14/3 14/4 23/11 25/5 35/14 40/12 40/18
acceptable [1] 16/7
accepted [5] 5/9 11/25 14/10 21/12 21/18
accepting [1] 23/16
accurate [1] 40/19
acknowledge [1] 28/18
acknowledged [2] 26/4 26/5
acknowledging [1]

25/19
Acosta [2] 2/8 3/11
Act [3] 24/18 25/17 28/20
activities [1] 29/18
actual [1] 28/25
actually [7] 24/25 25/12 30/19 33/9 34/4 34/20 41/21
add [2] 27/8 27/21
address [3] 24/5 29/23 38/9
admissions [1] 20/9
admits [2] 20/25 21/20
admitted [2] 22/18 30/21
affirmance [1] 28/2
affirmative [7] 5/1 9/3 9/16 20/8 24/3 42/5 42/7
affirmed [1] 33/19
affix [2] 15/7 15/11
affixed [4] 15/19 19/4 21/18 29/19
afoul [1] 9/9
after [8] 4/14 6/1 11/13 11/16 14/12 15/20 23/14 26/19
again [6] 6/13 7/7 8/21 12/17 25/21 27/16

**A**

against [1]  9/16
ago [1]  26/8
agree [13]  5/23
8/21 8/22 8/24 9/7
18/4 18/6 23/4 23/7
23/11 35/24 36/12
41/19
agreed [6]  11/4
12/7 12/20 13/8
15/2 15/18
agreement [17]
9/24 10/2 10/4
15/21 15/23 17/24
17/25 18/1 21/21
22/23 25/23 34/1
34/22 35/3 37/5
37/5 38/3
agreements [1]
16/9
all [22]  4/10 4/15
5/7 7/3 10/9 11/21
17/16 19/5 19/14
23/16 27/11 27/17
30/11 31/8 31/12
32/18 35/2 38/4
38/5 38/18 38/21
42/10
allegation [3]  21/5
22/12 29/19
allegations [12]
10/9 11/3 17/18

20/8 20/9 21/7
23/16 23/18 25/6
35/1 36/17 38/1
allege [1]  15/5
alleged [5]  12/6
13/12 19/22 19/23
29/18
alleges [4]  14/11
21/9 21/12 21/18
alleging [2]  16/2
38/2
allow [2]  4/14 12/7
allowing [1]  13/6
allows [1]  34/11
alone [1]  37/24
along [1]  30/11
already [2]  23/17
37/7
also [21]  2/19 3/11
3/14 3/17 3/21 8/22
8/24 9/7 9/13 9/24
12/6 19/23 21/18
21/20 22/11 23/11
25/2 27/6 28/7 40/8
41/15
alter [1]  9/8
altered [1]  37/11
alternate [1]  34/18
although [1]  25/13
am [5]  17/13 24/17
28/23 35/24 38/22
ambiguities [1]

34/1
ambiguity [13]  9/6
15/9 20/5 20/6
33/14 34/13 34/14
34/17 34/21 34/25
35/1 35/2 35/23
ambiguous [4]  16/5
16/7 16/12 16/15
amend [1]  27/14
Americas [1]  2/13
analysis [11]  9/3
25/15 26/16 29/16
30/9 31/10 39/4
41/2 41/12 41/16
41/25
analyze [1]  32/16
another [6]  11/13
11/16 27/5 35/6
36/22 39/13
answer [6]  6/12
8/12 22/2 23/8
24/10 36/9
answered [1]  27/20
answering [1]  7/24
any [7]  5/24 6/24
9/15 16/6 19/16
40/10 41/25
anything [4]  27/8
27/21 31/12 39/9
apologize [1]  26/5
App [1]  34/8
Appeals [1]  34/5

## A

APPEARANCES [1] 2/2
appears [2] 5/9 32/7
application [6] 9/9 15/25 16/13 30/19 35/10 40/4
applied [1] 16/22
apply [5] 17/22 30/25 31/16 33/24 36/6
applying [1] 28/3
appreciate [3] 10/19 13/5 38/24
April [3] 1/6 3/2 43/9
apt [1] 33/4
are [48]
aren't [2] 33/5 39/11
argued [1] 35/10
argues [1] 21/3
arguing [2] 30/10 30/11
argument [20] 1/14 4/3 9/6 10/23 14/20 22/19 25/20 29/13 29/17 31/10 33/9 34/16 34/19 37/1 38/25 39/5 40/13 41/4 41/11 41/12

arguments [3] 4/20 6/10 9/18
arise [1] 10/2
arises [1] 26/18
arising [1] 11/17
art [1] 28/19
as [82]
aside [4] 21/16 25/18 25/22 27/17
ask [4] 4/6 4/13 20/19 31/14
asking [4] 35/8 35/14 37/4 37/16
assert [2] 10/20 41/4
asserted [1] 41/21
asserting [2] 12/20 14/21
assertion [1] 23/12
asserts [2] 7/19 41/13
assistant [1] 3/22
assume [3] 6/3 16/11 16/20
assumes [1] 5/21
attacked [1] 26/15
attempts [1] 9/8
author [4] 24/18 24/20 24/24 26/23
authored [2] 10/13 37/23
authorized [5]

25/23 26/13 26/18 26/19 27/5
authorship [2] 24/16 24/19
Ave [1] 2/22
Avenue [2] 2/13 2/17
aware [2] 12/12 12/13

## B

back [6] 24/15 33/13 36/17 37/24 38/8 38/16
badly [1] 36/25
ballgame [1] 37/16
bars [1] 23/18
based [5] 21/11 21/14 22/23 32/8 34/13
Bashant [1] 9/22
basic [1] 30/18
basketball [1] 29/5
be [53]
because [23] 5/3 9/12 11/22 14/11 19/6 20/19 22/24 24/16 26/22 27/8 27/10 27/25 31/11 31/18 31/24 32/25 33/5 33/15 34/5 34/22 39/11 39/12 41/2

**B**

been [13]  6/24
 10/16 15/22 15/23
 25/22 30/11 30/23
 33/5 38/25 39/6
 39/14 41/3 41/11
before [13]  1/16 7/9
 9/15 10/1 10/17
 10/22 17/24 18/12
 18/17 19/14 21/1
 34/23 40/3
begins [1]  19/14
behalf [9]  3/8 3/9
 3/12 3/14 3/16 3/18
 3/20 9/19 20/3
being [10]  6/1
 10/23 12/4 12/12
 17/12 22/25 23/18
 23/20 37/11 40/10
believe [6]  6/9 6/14
 20/12 23/8 26/25
 32/24
belong [2]  15/19
 22/24
below [1]  43/4
between [21]  8/9
 8/10 10/4 10/24
 11/7 18/22 19/1
 19/3 19/9 19/16
 19/19 21/11 27/22
 29/18 32/2 32/10
 36/3 36/19 37/2

37/17 39/11
beyond [2]  13/19
 27/23
big [1]  19/16
bit [1]  24/14
black [1]  17/14
Bonita [3]  2/21
 43/9 43/10
both [11]  6/11 6/18
 7/5 8/23 12/10 20/8
 21/23 22/7 24/18
 26/24 41/2
brand [1]  5/4
brand-new [1]  5/4
breach [1]  37/8
breath [1]  4/17
brief [8]  4/23 6/14
 21/3 25/13 26/15
 30/8 34/22 42/6
briefed [3]  25/13
 27/19 27/23
briefing [1]  40/17
briefly [3]  29/13
 32/19 35/5
bring [1]  18/4
brings [3]  7/9 18/13
 18/13
broadly [1]  6/13
Broadway [2]  2/6
 2/9
brought [3]  13/2
 33/5 39/12

**C**

California [2]  26/4
 34/5
call [9]  3/5 5/5 5/15
 6/6 13/9 24/4 28/8
 36/2 41/24
called [1]  21/14
calls [4]  7/21 22/5
 22/6 22/8
came [3]  5/14 6/6
 14/5
can [24]  6/17 8/22
 10/18 12/17 13/16
 16/16 17/6 17/8
 17/16 18/25 21/15
 24/5 26/8 27/22
 28/6 30/1 33/14
 33/16 36/16 38/9
 38/18 40/15 40/21
 41/16
can't [6]  13/15
 13/15 20/22 33/10
 33/15 35/3
cannot [1]  29/9
career [1]  22/16
case [21]  1/4 4/3
 4/22 4/25 6/22 7/17
 8/14 8/14 9/22
 20/20 26/3 26/25
 26/25 27/3 29/10
 32/5 32/25 34/8
 39/8 41/17 41/20

**C**

cases [1]  27/1
Casey [2]  2/16 3/19
categorically [1]  42/3
cause [1]  43/6
Central [1]  26/3
certain [3]  4/14 5/21 11/23
certainly [4]  10/19 17/8 21/3 22/16
certified [1]  43/7
certify [1]  43/4
cetera [1]  29/2
chance [1]  24/2
change [2]  37/17 37/18
changes [2]  37/14 37/20
characters [3]  27/4 27/7 27/12
Christopher [2]  2/5 3/13
Circuit [7]  16/5 25/3 26/2 27/1 27/7 32/17 33/19
Circuit's [1]  28/2
circumstance [2]  26/17 35/23
circumstances [1]  34/13
cite [1]  34/7

cited [2]  26/3 26/14
citing [1]  34/9
claim [2]  27/15 33/10
claiming [2]  30/14 30/15
claims [1]  22/9
clarifying [1]  13/6
clarity [1]  14/21
claw [72]
clear [16]  10/13 11/3 11/14 14/14 15/9 15/15 15/17 23/1 24/19 25/6 26/2 34/6 37/4 38/1 38/6 41/20
clearly [2]  13/10 21/15
client [2]  24/17 32/23
client's [1]  31/18
closer [1]  28/8
clothing [1]  7/12
co [2]  30/18 30/21
co-counsel [2]  30/18 30/21
college [1]  5/10
combination [3]  30/20 30/22 30/22
combined [1]  29/1
come [8]  7/2 17/25 18/1 23/10 24/6

31/18 33/15 36/7
comes [4]  18/10 36/10 37/10 40/7
Comics [1]  26/24
comment [1]  38/9
common [3]  8/18 32/11 37/19
communications [4]  11/18 15/14 16/9 17/19
Community [1]  24/22
compared [2]  31/17 41/8
complaint [29]  6/16 10/12 11/21 12/1 12/7 12/16 12/21 12/22 13/1 13/10 13/12 13/24 14/3 14/10 14/11 14/14 15/3 19/22 19/23 20/9 22/5 22/13 39/18 40/13 40/14 40/15 40/19 40/22 40/23
complaint's [2]  20/21 23/11
compositions [1]  33/23
comprised [1]  10/14
conceived [1]  34/23

**C**

concepts [1]  17/9
concluded [1]  42/12
conclusion [3]  4/22 14/4 14/9
conclusive [1]  20/13
conclusively [2]  20/10 23/18
conduct [5]  15/20 16/10 17/4 17/4 17/20
confirmed [5]  12/8 12/9 12/14 12/14 12/23
confirming [1]  15/15
conflated [1]  21/16
conflates [1]  5/21
conformed [1]  43/7
confusing [1]  24/14
confusion [1]  30/10
connection [14]  16/4 16/18 17/16 17/23 21/6 21/20 22/6 22/25 23/2 34/19 35/22 36/14 38/3 39/16
consider [4]  6/17 13/18 16/8 34/12
consideration [4]
6/15 17/6 17/9 32/1
considered [5]  16/17 24/18 25/11 25/14 35/3
consistent [2]  15/21 22/16
contained [1]  35/15
contemplate [1]  34/23
contemporaneous [2]  16/24 17/12
contend [1]  31/11
contention [1]  39/14
continue [1]  12/9
continued [8]  11/9 11/9 12/15 12/23 13/13 14/12 15/4 18/24
continues [1]  29/18
continuous [1]  39/10
continuum [5]  6/21 7/5 7/7 7/16 12/11
contract [73]
contractual [3]  6/11 6/12 40/9
contradict [2]  34/1 35/2
contrary [1]  17/12
control [1]  6/16
conversations [1]
16/21
convinced [1]  11/18
copyright [39]  6/7 6/8 6/11 6/19 7/5 7/13 8/10 8/11 9/12 21/23 22/8 23/8 24/18 25/2 25/16 25/17 26/1 26/12 26/20 26/21 27/4 27/6 27/10 27/15 28/20 28/22 29/10 30/21 33/18 35/11 36/25 37/2 37/22 39/3 40/9 40/16 41/3 41/14 42/9
copyrightable [4]  8/19 9/13 28/24 41/15
copyrighted [3]  26/24 41/22 41/22
copyrights [3]  7/4 8/9 23/1
correct [7]  9/11 17/21 23/6 23/25 31/23 40/12 43/5
correctly [1]  30/18
costume [1]  26/25
costumes [3]  27/5 27/7 27/11
couch [1]  34/16
could [5]  18/4 23/24 24/1 27/20

## C

could... [1] 37/6
couldn't [2] 17/25 18/1
counsel [11] 3/4 3/23 24/10 24/17 30/18 30/21 30/21 38/6 38/15 38/18 40/18
counsel's [2] 5/19 29/17
counterclaim [2] 20/25 22/2
counterclaims [1] 20/10
couple [2] 4/23 24/12
court [23] 1/1 1/17 2/21 4/5 4/12 8/5 9/21 16/5 17/18 21/1 22/17 24/24 29/5 32/4 33/10 33/16 33/21 33/24 34/5 34/10 34/12 36/18 43/11
Court's [2] 31/4 32/1
Courthouse [1] 2/22
covered [4] 18/6 18/9 18/15 40/25
crafted [1] 9/25

create [8] 11/8 11/10 18/14 30/14 33/1 33/2 35/1 35/23
created [20] 10/1 10/6 10/12 11/16 13/13 13/19 17/23 17/24 18/3 18/16 21/2 21/20 22/25 23/2 23/2 30/16 35/22 36/13 38/2 40/3
creates [2] 24/25 34/25
creating [2] 14/1 21/7
creation [4] 10/16 14/17 19/3 34/23
creative [2] 6/24 24/23
creativity [1] 28/20
creator [1] 26/18
creators [1] 26/19
critical [1] 7/17
crowns [1] 11/12
CRR [2] 2/21 43/10
CSR [2] 2/21 43/10
cv [2] 1/4 4/3

## D

DATE [1] 43/10
day [3] 8/14 25/14 42/10

DC [1] 26/24
deal [1] 29/15
dealing [1] 27/13
December [3] 6/2 13/25 20/16
decide [4] 4/21 16/21 24/11 36/6
decided [2] 16/15 18/22
deciding [3] 35/12 36/10 41/20
decision [2] 28/2 34/11
declaration [1] 22/1
deemed [1] 17/16
deeply [1] 27/24
defeat [2] 32/12 33/10
Defendant [2] 1/7 2/12
defenses [6] 5/1 9/3 9/16 24/3 42/5 42/7
degree [3] 39/4 40/17 41/1
depend [2] 10/23 36/1
depending [1] 40/20
depends [2] 18/9 39/8
depicted [1] 21/25

**D**

depiction [1]  22/16

derivative [23]
24/13 25/11 25/14
25/15 25/21 25/22
25/24 26/6 26/11
26/18 26/19 26/23
27/10 27/16 30/9
30/14 30/15 31/10
31/11 36/10 41/6
41/10 41/18

described [3]  12/15
13/11 39/17

describes [1]  13/24

design [81]

designers [1]  25/8

designs [4]  11/11
11/12 11/16 20/11

determination [8]
8/6 11/8 13/17
16/10 16/16 27/22
28/6 31/6

determinations [1]
33/11

determine [10]
16/17 18/25 19/2
25/24 26/1 26/6
31/15 31/22 33/17
35/9

determined [1]
11/10

dictates [1]  28/1

did [11]  10/5 12/3
15/13 15/17 15/24
19/22 20/4 25/7
25/13 40/10 40/10

didn't [4]  10/2 27/8
27/24 37/13

difference [1]  37/2

differences [13]  8/6
8/19 10/24 19/9
19/16 19/19 26/22
31/3 36/2 36/8
36/19 36/19 39/11

different [22]  4/12
15/10 18/12 21/4
21/17 24/12 25/5
25/12 25/15 26/11
26/16 26/17 27/25
31/24 31/25 35/11
36/6 37/15 39/24
40/4 40/6 40/22

differently [1]
40/22

difficulty [1]  38/24

digress [1]  5/16

digression [1]  6/14

direction [2]  17/18
25/7

directions [1]  24/20

disagree [1]  16/12

disagreement [1]
33/15

discrete [1]  36/16

discuss [3]  19/7
20/6 33/4

discussed [2]  10/3
33/14

discussing [1]
26/16

discussions [4]  16/1
16/24 17/12 21/6

dispute [3]  8/9 8/10
22/4

distance [1]  35/7

distinct [6]  8/17 9/1
9/13 23/5 24/8
25/20

distinctions [1]
25/17

DISTRICT [5]  1/1
1/2 1/17 2/22 26/3

DLA [3]  2/13 3/16
3/18

do [30]  3/4 3/6 4/5
4/7 4/13 4/18 5/4
13/4 15/25 16/12
23/7 23/8 25/7 26/8
27/21 29/12 29/17
30/25 31/16 32/19
32/20 33/15 33/20
33/21 33/25 35/2
35/14 36/10 38/17
40/5

does [9]  3/25 4/12
9/24 9/24 10/23

# D

does... [4]  24/10 24/21 34/16 35/9
doesn't [9]  12/21 16/15 17/3 17/22 18/10 31/10 34/22 35/1 37/18
doing [2]  7/1 37/8
don't [7]  13/16 15/8 16/20 17/1 17/16 20/6 41/20
done [2]  26/8 31/5
down [2]  34/19 35/7
drafted [1]  6/1
drafting [2]  14/16 14/17
drawings [1]  36/20
drawn [2]  22/9 29/1
drew [2]  22/14 28/21
drill [1]  34/19
due [1]  32/17
Durham [2]  26/14 36/11
during [10]  10/2 11/6 12/4 12/11 13/19 16/6 21/19 21/21 21/22 24/4
Duvdevani [3]  2/12 3/16 20/3

# E

earlier [1]  35/15
early [1]  5/9
easier [1]  32/24
effect [1]  21/21
efforts [1]  18/11
either [3]  29/6 39/11 40/20
element [4]  29/6 32/2 32/7 32/11
elements [11]  8/4 8/18 10/14 28/4 28/9 28/12 29/7 30/20 31/1 31/2 31/25
else [1]  4/16
employment [1] 16/6
end [4]  7/4 7/7 25/14 32/8
ended [1]  19/18
endorsement [1] 6/2
endorsers [1]  11/5
ends [4]  6/21 7/16 9/2 41/12
engaged [2]  11/17 27/15
enough [4]  32/12 36/6 37/16 39/24
enter [1]  37/7
entered [6]  6/1 6/4

10/22 18/13 18/17 25/23
entering [4]  5/14 5/24 23/14 35/17
entire [3]  21/21 31/11 39/8
entitled [3]  25/1 27/9 43/6
era [1]  4/11
especially [1]  13/7
essence [1]  27/10
essential [1]  41/25
essentially [4] 26/23 29/8 33/25 39/7
establish [2]  20/10 34/13
establishes [1] 33/23
esteemed [1]  30/17
estoppel [3]  17/9 23/25 24/2
et [1]  29/2
et cetera [1]  29/2
even [17]  6/25 8/24 9/17 16/14 17/2 17/2 22/22 23/14 27/20 31/3 32/24 34/4 35/1 41/1 41/4 41/17 41/25
event [1]  41/25
eventually [2]

**E**

eventually... [2] 18/10 19/17

ever [2] 18/17 40/3

every [1] 29/8

everyone [1] 38/17

everything [2] 14/1 28/16

evidence [17] 9/9 16/1 16/8 16/13 16/23 17/10 17/15 17/21 19/1 23/17 33/24 34/3 34/3 34/9 34/11 34/12 35/4

exact [1] 25/25

exactly [8] 14/25 14/25 16/19 17/11 18/20 18/20 19/21 34/2

example [2] 20/21 41/5

exceptions [1] 34/12

excuse [2] 19/16 28/11

execution [1] 11/7

existed [1] 40/3

existence [2] 5/23 10/16

explain [2] 33/25 34/14

explained [1] 34/10

explains [1] 27/7

explicit [2] 12/10 33/22

express [1] 34/11

expressed [2] 29/2 32/6

expression [6] 24/22 25/1 25/9 28/24 30/23 31/19

extent [1] 26/13

extract [1] 30/25

extremes [1] 6/22

extrinsic [9] 28/3 29/23 30/17 30/25 31/4 32/8 32/17 33/11 34/12

extrinsically [1] 8/4

**F**

F.3d [1] 33/19

fact [13] 8/6 18/16 19/2 23/12 25/5 25/22 27/3 31/7 31/21 32/12 36/18 39/20 40/23

facts [3] 5/8 6/22 16/10

factual [1] 26/17

failed [1] 41/9

fair [3] 35/20 35/24 36/4

fairly [1] 41/1

fall [3] 9/24 10/5 36/17

fallacy [1] 36/15

Family [1] 33/18

far [2] 14/21 40/12

favor [1] 31/18

favoring [1] 8/24

feel [1] 38/7

final [1] 30/12

finally [1] 24/7

find [8] 5/20 27/1 32/10 33/8 33/11 40/5 40/6 40/24

finder [4] 8/7 31/7 31/21 32/13

finders [1] 19/2

finding [2] 16/19 39/19

first [13] 3/5 6/9 6/23 7/4 13/17 17/15 22/12 22/21 24/16 25/4 30/6 36/12 36/14

fix [2] 24/21 25/8

fixed [1] 25/1

Floor [1] 2/6

flower [1] 28/21

follow [3] 28/1 31/9 35/5

followed [1] 21/23

footing [1] 40/4

footnote [1] 34/10

**F**

forces [1]  14/3
foregoing [1]  43/4
foremost [1]  25/4
form [2]  30/24
 39/12
formation [3]  23/21
 23/22 34/14
formulated [2]
 35/17 36/25
forward [1]  22/17
forwarded [2]
 20/17 21/5
found [2]  16/5 23/8
Fox [1]  33/18
fraud [1]  34/14
free [1]  38/7
front [4]  8/10 8/13
 22/17 41/21
fully [1]  35/16
fundamentally [1]
 7/20
further [1]  31/5
future [1]  41/20

**G**

gain [1]  26/23
game [1]  14/10
Ganas [2]  2/12 3/17
gave [7]  13/17
 14/14 14/15 15/11
 19/12 19/17 22/20

gazillion [1]  33/6
GC [1]  3/22
general [1]  24/24
generally [2]  27/3
 28/1
generic [1]  31/20
get [7]  9/15 25/16
 26/11 26/13 30/2
 38/8 40/12
gets [1]  24/14
Ginsberg [3]  2/4
 3/7 9/21
give [1]  13/8
given [1]  27/11
gives [1]  40/8
giving [2]  13/20
 42/7
global [1]  3/22
go [5]  10/8 26/19
 27/24 33/13 41/13
goes [1]  4/22
going [17]  3/4 5/3
 5/13 5/16 11/10
 11/15 18/23 19/1
 20/15 20/18 26/23
 36/22 37/22 37/24
 38/5 38/6 42/5
Good [8]  3/4 3/7
 3/15 3/17 3/19 3/24
 38/15 42/10
got [6]  6/3 6/6 6/8
 37/13 37/16 37/20

grand [2]  29/5 32/3
grant [4]  12/3
 20/23 39/3 42/8
granted [4]  10/7
 12/2 15/5 29/21
guess [4]  13/23 14/3
 17/10 23/11

**H**

had [19]  5/10 6/23
 8/10 10/6 10/7
 10/16 10/21 11/23
 13/12 14/4 14/19
 18/7 18/12 18/16
 22/15 23/13 31/15
 35/16 40/2
hand [13]  5/12 7/1
 22/14 22/14 23/19
 28/4 28/10 28/13
 28/25 29/9 30/22
 32/6 33/3
hands [2]  10/15
 29/3
happen [1]  37/13
happened [2]  12/11
 15/10
happens [2]  14/2
 18/21
hard [1]  36/23
Harris [1]  34/8
has [31]  6/25 7/8
 7/15 8/3 10/5 11/5
 12/15 13/11 14/9

# H

has... [22]  14/16 14/17 15/1 15/12 15/16 18/22 23/12 26/2 26/4 26/5 26/22 28/17 28/17 28/23 29/2 34/6 36/10 39/1 39/6 39/14 41/3 41/11

have [29]  3/6 3/11 3/13 4/5 4/15 5/4 9/16 11/6 15/14 15/22 15/23 22/9 24/2 25/22 27/19 28/22 29/8 29/15 30/19 32/22 34/2 34/17 35/10 38/17 39/23 39/23 40/12 41/20 41/21

haven't [1]  5/21

having [3]  26/8 36/2 41/12

he [52]

he forwarded [1]  20/17

he's [4]  21/2 25/19 34/20 34/21

hear [7]  4/17 4/20 4/21 19/1 38/18 38/25 42/5

hearing [5]  4/11 9/6 22/22 24/17 36/24

help [1]  37/11

helpful [3]  5/20 10/8 38/25

her [1]  9/23

Herbold [1]  2/9

here [31]  4/9 4/23 5/3 5/9 5/16 5/18 6/10 6/13 7/22 7/25 13/16 18/21 20/11 21/17 23/4 25/6 27/13 28/8 30/19 31/12 33/2 34/2 35/24 37/9 38/17 38/19 38/21 39/5 39/20 41/23 42/2

him [4]  7/10 7/10 10/14 11/5

himself [1]  29/2

hire [1]  33/23

his [33]  3/25 5/10 5/11 5/12 5/13 7/1 7/1 10/14 10/15 10/15 11/13 11/19 11/19 19/11 20/9 20/9 20/9 21/3 21/7 21/25 22/5 22/13 22/13 22/14 22/15 23/16 24/17 27/14 29/3 32/6 34/16 34/22 40/18

Hoffman [1]  9/7

hold [4]  38/5 38/7 38/8 38/12

Honor [58]

Honor's [1]  17/17

HONORABLE [1] 1/16

hornbook [1]  17/10

house [1]  3/23

how [5]  3/25 37/1 37/18 40/13 41/25

However [2]  22/22 36/12

hypotheses [1]  6/22

hypothetical [4] 6/21 7/8 35/25 36/1

hypothetically [2] 31/15 37/15

hypotheticals [1] 35/16

# I

I'd [9]  4/18 8/12 8/12 9/5 9/15 29/15 31/14 31/17 35/5

I'll [20]  4/13 4/21 5/15 5/16 5/24 6/13 9/17 20/1 22/11 23/10 24/6 27/1 30/8 33/5 34/7 35/14 36/25 38/12 41/24 42/6

I'm [25]  3/4 4/19 4/20 4/25 5/3 5/13 5/16 9/5 13/1 13/2

# I

I'm... [15]  13/23 20/15 20/18 20/20 22/22 36/9 36/22 37/1 37/4 37/16 37/22 38/4 38/6 41/25 42/5

I've [2]  9/18 36/25

idea [15]  5/10 7/1 10/12 10/21 18/6 25/1 28/4 29/2 29/4 29/6 30/23 31/20 33/3 33/7 37/19

ideas [4]  24/20 25/7 28/15 28/16

identical [1]  33/9

identified [2]  15/2 15/12

identify [1]  4/7

ignore [6]  17/18 17/19 17/19 17/19 29/18 36/15

ignores [1]  4/16

illegality [1]  34/15

illustrate [1]  7/17

image [1]  22/17

images [6]  21/17 22/20 22/24 25/5 25/20 36/16

important [8]  6/9 11/2 12/6 12/19 19/6 25/17 39/5 40/7

importantly [1] 40/17

imposed [1]  28/13

in-house [1]  3/23

inapplicability [1] 34/21

INC [3]  1/6 4/4 25/3

inclined [1]  35/24

included [1]  4/15

including [1]  31/12

inconsistent [1] 17/4

incorporates [1] 7/12

incorporating [3] 5/11 28/4 29/3

independent [3] 8/20 8/25 19/11

independently [1] 22/21

indiscernible [1] 28/21

infringement [4] 26/1 26/20 27/6 27/15

inherently [2]  16/4 16/7

initial [3]  35/8 39/2 39/19

initials [6]  5/11 7/1 10/15 22/15 28/10 28/13

inside [1]  22/14

instead [2]  8/18 41/10

intellectual [22] 5/18 7/14 7/19 7/22 7/25 8/1 8/17 9/1 23/5 23/13 24/8 29/16 29/24 37/7 39/7 39/10 39/15 39/20 40/25 41/7 41/22 42/2

intending [1]  4/19

interest [1]  7/15

interested [1]  9/6

interference [1] 24/4

interject [1]  4/14

interpretation [2] 23/22 34/18

interrupt [1]  4/16

interruption [2]  5/1 5/13

intrinsic [1]  31/6

invoked [1]  40/1

involve [1]  17/3

involved [2]  31/19 37/14

IP [2]  3/22 34/25

is [179]

isn't [3]  8/15 31/10

## I

isn't... [1]  33/4
issue [15]  6/9 6/9
 7/17 8/15 9/23
 14/17 20/4 20/11
 23/20 25/12 26/10
 27/14 30/19 33/13
 35/8
issues [9]  6/12
 23/19 23/24 24/1
 24/13 27/25 29/24
 32/15 38/24
it [85]
it's [19]  4/1 8/22
 9/5 9/17 11/2 11/6
 12/19 14/14 15/9
 16/7 29/6 30/23
 30/23 33/4 37/4
 37/14 37/20 38/24
 41/17
items [1]  29/20
iteration [2]  10/2
 12/4
iterative [4]  6/5
 14/5 19/14 39/17
its [7]  9/8 13/18
 20/1 25/15 26/14
 39/2 40/16
itself [9]  6/14 21/15
 28/25 32/4 39/18
 40/7 40/16 41/10
 41/18

## J

Jack [3]  2/19 3/22
 3/25
January [2]  13/25
 20/17
jete [2]  29/5 32/3
job [1]  31/5
John [2]  2/16 3/19
joined [1]  5/4
joint [1]  18/11
Jordan [2]  29/5
 32/3
JUDGE [6]  1/17
 4/9 9/22 13/5 16/3
 38/15
judgment [3]  5/2
 39/1 42/8
jump [1]  20/5
June [7]  6/8 11/25
 13/8 14/14 15/1
 15/5 15/10
June 2014 [2]  11/25
 15/5
jurisprudence [1]
 24/19
just [25]  4/19 4/23
 5/4 5/16 6/24 7/8
 7/21 10/18 16/5
 19/6 19/19 20/5
 20/5 20/18 20/22
 22/19 23/2 28/1
 29/24 32/25 33/15
 34/7 36/8 38/10
 41/11

## K

Katherine [2]  2/8
 3/11
KAWHI [3]  1/3
 5/10 7/8
keep [2]  24/16 30/8
keeps [1]  18/17
key [1]  32/2
kick [3]  37/18
 37/18 37/21
KL [2]  22/15 32/5
KL2 [2]  11/19
 30/22
know [8]  3/21 12/4
 17/10 20/22 24/9
 28/20 36/17 36/25
knows [1]  26/8

## L

lack [1]  33/11
language [9]  6/13
 16/4 16/6 16/12
 17/5 17/22 22/23
 27/17 34/17
large [2]  10/14
 22/14
largely [1]  26/15
last [1]  3/25
later [1]  24/4
law [14]  7/6 7/13

## L

law... [12] 23/9 24/10 26/21 29/10 34/4 34/5 35/11 35/12 36/25 37/2 39/3 41/3
lay [1] 4/23
leaning [1] 17/17
least [5] 5/9 23/20 31/21 35/21 38/8
leave [2] 8/5 38/7
left [6] 20/5 28/5 28/7 28/16 31/1 31/21
legal [3] 5/21 6/10 36/15
LEONARD [145]
Leonard's [18] 5/19 5/20 12/13 12/22 12/24 14/17 15/14 18/11 19/3 20/8 20/25 31/14 33/2 36/17 37/25 39/6 41/3 41/11
let [5] 3/21 19/5 31/9 32/22 38/6
letter [2] 17/14 28/10
Levin [2] 2/8 3/12
licensee [2] 27/5 27/6
light [4] 5/8 8/24

9/18 42/1
like [12] 4/18 5/4 9/15 16/5 17/9 19/13 23/24 29/15 29/23 31/14 35/5 41/6
listening [1] 32/23
litigation [2] 3/22 8/23
little [1] 24/14
live [1] 4/11
LLP [3] 2/5 2/13 2/16
logo [45]
logos [1] 15/10
long [3] 25/4 36/14 36/15
look [12] 8/18 11/2 16/20 19/19 20/24 22/11 26/21 27/17 31/2 33/16 36/18 37/25
looked [1] 19/13
looking [7] 8/15 8/18 25/5 31/12 36/13 40/15 41/7
looks [2] 28/25 37/25
lot [2] 27/25 36/19
low [1] 28/20

## M

made [11] 5/22 11/23 12/1 12/9 14/19 26/2 27/5 33/23 34/6 38/10 41/12
main [2] 13/23 31/9
maintains [1] 23/13
make [22] 4/14 4/20 8/19 9/18 11/3 11/14 11/23 13/13 13/16 15/25 16/10 16/12 20/20 27/22 28/6 31/9 32/22 33/6 33/10 38/6 40/23 41/16
makes [4] 10/13 22/12 23/1 24/19
making [7] 4/20 15/15 15/17 16/16 25/20 27/6 29/5
many [5] 31/25 31/25 33/1 33/1 33/2
mark [1] 18/23
marketable [1] 11/24
Markowitz [1] 2/9
material [3] 8/19 10/24 37/20
materially [2] 18/12 40/5

# M

Matt [2]  3/11 3/17

Mattel [2]  16/6 33/4

matter [6]  7/5 31/5 35/13 39/2 39/19 41/14

Matthew [2]  2/8 2/12

may [6]  6/7 6/17 8/14 9/20 31/3 34/12

maybe [1]  13/25

me [18]  4/14 4/17 4/22 8/10 8/13 13/6 19/5 19/16 20/4 24/10 28/11 31/9 32/21 32/22 35/10 37/5 38/6 41/21

mean [3]  13/2 13/4 35/21

meaning [1]  16/21

meaningful [2]  9/2 10/14

meaningfully [1] 40/15

means [3]  13/1 20/23 29/8

meant [1]  20/22

medium [2]  24/22 25/9

memory [1]  17/10

merchandise [4] 15/7 15/12 15/19 21/19

mere [3]  24/20 25/7 41/5

merely [3]  7/11 41/10 41/18

methodology [5] 7/24 8/8 8/12 24/9 24/10

MICHAEL [2] 1/16 29/5

middle [1]  6/23

might [3]  9/18 17/5 35/21

mind [1]  24/16

mine [1]  4/15

minimum [1]  28/19

minor [2]  11/25 31/13

minute [1]  42/6

minutes [4]  4/23 38/7 38/8 38/12

Mitchell [3]  2/4 3/9 30/7

MO [2]  1/4 4/3

modification [1] 29/20

modifications [7] 11/23 12/1 13/14 14/18 18/25 30/13 31/13

modified [10]  14/17 14/18 19/11 19/23 21/9 21/10 22/5 22/20 22/24 32/7

modify [3]  11/9 14/12 18/24

moment [11]  5/3 5/16 10/18 16/11 19/6 20/19 23/10 24/6 27/2 30/2 38/5

monopoly [3]  26/23 27/11 29/8

more [7]  24/20 25/7 29/15 31/18 34/4 34/8 40/17

morning [7]  3/4 3/7 3/15 3/17 3/19 3/24 38/15

MOSMAN [3]  1/16 4/9 38/15

most [2]  6/10 31/13

motion [14]  4/25 5/2 5/9 5/12 9/3 9/4 9/17 23/15 24/4 32/12 33/17 39/2 39/3 42/8

moved [1]  39/1

Mr [9]  2/4 2/4 2/5 2/8 2/12 2/16 2/19 3/12 10/13

Mr. [97]

Mr. Jordan [1]

## M

Mr. Jordan... [1]
 32/3
Mr. Leonard [81]
Mr. Leonard's [12]
 5/19 12/13 14/17
 15/14 18/11 19/3
 20/8 20/25 31/14
 39/6 41/3 41/11
Mr. Stein [3]  29/15
 29/23 32/25
Ms [2]  2/8 2/12
much [9]  9/6 15/8
 19/25 22/15 28/7
 29/11 32/18 37/18
 38/4
multiple [2]  11/5
 11/11
must [5]  8/5 10/10
 10/20 38/1 40/23
mute [1]  4/7
my [19]  4/18 7/4
 8/8 8/15 8/21 9/16
 16/6 17/10 18/15
 19/8 30/17 32/23
 35/7 35/15 36/9
 36/23 39/4 39/19
 42/7

## N

name [1]  3/25
necessarily [2]  18/9
35/18
need [5]  20/6 20/19
 27/17 33/8 41/8
needs [1]  14/13
never [3]  6/24 21/3
 37/13
new [10]  2/6 2/14
 5/4 18/15 18/16
 39/23 39/24 40/5
 40/24 40/24
next [1]  7/23
NIKE [117]
Nike's [14]  5/1 9/17
 12/24 20/7 20/10
 20/25 21/6 22/3
 24/4 25/8 39/14
 40/13 41/23 42/8
Nike-owned [1]
 15/21
Ninth [9]  2/17 16/5
 25/2 26/2 26/25
 27/7 28/2 32/16
 33/19
no [12]  1/4 4/3 4/11
 5/6 10/23 11/1
 14/11 20/24 22/4
 22/19 34/24 38/11
non [15]  10/24 12/5
 12/11 12/13 15/4
 15/24 24/23 26/22
 31/1 31/11 32/2
 36/2 36/8 36/19
39/24
non-derivative [1]
 31/11
non-Nike [5]  12/5
 12/11 12/13 15/4
 15/24
non-protectable [2]
 31/1 32/2
non-trivial [6]
 10/24 26/22 36/2
 36/8 36/19 39/24
Non-violence [1]
 24/23
not [66]
notably [1]  22/13
note [2]  6/13 36/18
nothing [1]  18/16
noting [1]  34/9
now [18]  4/17 5/5
 6/6 12/20 16/2 20/1
 22/1 24/5 25/10
 25/18 27/14 28/21
 30/4 33/5 37/4
 39/22 40/12 41/1
number [6]  5/11
 7/2 10/15 22/15
 28/13 32/5
NY [2]  2/6 2/14

## O

o0o [1]  43/2
objective [3]  28/6
 31/2 31/4

**O**

obtained [1] 21/23
obvious [2] 9/2 9/9
obviously [3] 20/19 21/19 32/15
off [2] 20/5 38/8
Office [1] 22/8
Official [1] 43/11
Oh [1] 37/3
okay [4] 20/7 30/3 30/5 37/3
once [2] 28/15 31/1
one [27] 6/25 7/21 7/24 11/13 11/16 14/3 15/9 18/8 21/13 25/19 26/25 29/17 30/12 32/2 34/7 35/9 35/15 36/16 36/20 36/23 38/9 39/7 39/10 40/8 41/11 41/20 42/2
ones [1] 37/20
ongoing [1] 13/13
only [8] 10/16 12/3 15/13 18/24 21/5 33/13 33/16 40/15
operative [1] 5/18
opinion [1] 42/6
opposed [1] 31/19
opposing [1] 30/21
opposite [1] 40/1

opposition [2] 21/3 22/19
oral [3] 1/14 4/3 38/25
order [4] 33/7 33/11 39/25 42/7
OREGON [5] 1/2 1/7 34/4 34/6 34/8
original [3] 7/1 27/9 43/6
other [14] 7/7 11/12 13/3 16/21 18/8 21/24 22/20 26/19 29/24 36/21 36/24 39/10 39/13 41/15
otherwise [2] 26/22 37/18
ought [3] 19/15 40/13 41/7
our [8] 5/12 6/21 6/22 7/17 8/13 23/15 25/13 41/23
out [14] 4/18 4/21 4/23 11/17 14/5 18/10 22/11 23/17 28/3 28/15 31/18 40/15 41/4 42/6
outset [1] 19/8
outside [2] 18/2 18/18
over [4] 13/17 22/1 26/23 27/11

own [6] 4/18 12/9 12/15 12/23 19/12 33/9
owned [6] 12/21 14/22 14/23 15/16 15/21 37/9
ownership [9] 22/1 30/14 30/15 33/18 34/24 35/9 35/18 41/14 42/9
owning [2] 7/6 37/7
owns [7] 6/10 9/12 9/13 23/1 35/8 35/12 39/2

**P**

paid [1] 6/3
paper [2] 24/21 25/8
paragraph [14] 10/12 12/1 12/24 15/2 15/13 15/18 20/22 21/8 21/12 22/12 22/23 23/1 37/25 40/20
paragraphs [4] 11/14 11/21 12/16 40/22
parameters [1] 37/10
parol [15] 9/9 16/1 16/8 16/13 16/23 17/10 17/15 17/21

**P**

parol... [7] 23/17 33/24 34/3 34/3 34/9 34/11 35/3

parsed [1] 40/15

part [2] 26/14 36/12

partially [1] 26/14

participant [1] 5/5

participate [1] 4/11

particular [2] 20/14 36/5

particularly [1] 5/20

parties [6] 15/20 17/25 22/6 22/7 35/10 37/5

parties' [7] 16/8 16/10 16/16 16/17 17/4 17/4 39/5

party [1] 24/25

path [1] 35/7

pause [7] 4/14 5/3 9/15 10/18 12/17 19/5 20/18

Payday [1] 25/3

PC [1] 2/9

pen [2] 24/21 25/8

perfectly [1] 16/7

performed [1] 8/23

perimeter [1] 36/7

permission [9] 10/7

12/2 12/3 13/8 13/21 14/15 15/6 15/11 29/21

permissions [1] 16/1

permit [1] 4/22

permitted [1] 34/3

person [3] 11/6 24/21 24/25

Peter [3] 2/4 3/7 9/21

petitions [1] 40/16

phone [4] 3/23 4/7 4/15 5/5

phones [1] 38/7

photograph [1] 33/1

photos [2] 31/24 32/3

phrase [1] 5/19

piece [14] 7/14 7/18 7/22 8/1 8/17 8/25 23/5 24/8 37/7 37/9 39/7 39/10 40/24 42/2

pieces [7] 5/18 7/25 39/15 39/20 39/21 41/7 41/21

Piper [3] 2/13 3/16 3/18

place [3] 4/2 33/4 36/14

places [1] 12/20

plaintiff [10] 1/4 2/4 3/6 8/25 20/14 21/23 22/4 22/8 22/9 33/20

plaintiff's [4] 22/3 24/17 25/6 42/1

play [3] 7/22 31/20 42/2

pleading [1] 21/25

pleadings [14] 5/2 9/25 10/9 10/19 10/20 11/3 20/12 22/3 22/4 24/14 25/6 27/14 39/1 42/8

pleads [1] 20/14

please [5] 4/6 4/7 4/22 9/20 11/20

plus [1] 14/18

point [5] 5/12 19/6 22/11 24/4 35/6

pointed [1] 23/17

points [1] 4/14

Portland [4] 1/7 2/10 2/17 2/23

position [11] 25/18 32/3 35/19 35/20 37/15 39/6 41/3 41/5 41/24 42/1 42/2

positions [1] 39/5

**P**

post [1]  7/3
posture [2]  20/20 41/17
potential [1]  5/18
precisely [2]  17/11 32/25
preclude [1]  16/15
predated [2]  10/17 35/17
predating [1]  39/13
preexisting [3]  7/10 18/5 35/19
prepared [2]  20/14 20/16
present [3]  2/19 3/6 6/22
presented [1]  19/24
prevent [3]  16/20 16/23 17/11
previous [1]  34/10
previously [1]  37/9
principal [2]  4/25 23/4
principle [1]  30/18
prior [5]  5/13 5/24 18/7 34/25 40/10
probably [4]  7/13 7/13 8/11 9/2
problem [2]  8/8 14/20
procedural [2]
20/20 41/17
proceeding [2]  6/15 6/18
proceedings [6] 1/15 4/6 4/12 27/21 42/12 43/5
proceeds [1]  31/5
process [9]  6/5 6/24 8/12 10/3 11/15 12/5 14/5 19/14 39/17
produced [2]  22/21 39/16
product [10]  7/18 12/10 12/11 12/13 15/3 15/4 15/7 15/24 30/12 41/10
products [1]  12/5
proffered [1]  9/25
prong [1]  26/16
proper [1]  17/20
properly [1]  8/22
Properties [1]  34/8
property [23]  5/18 7/14 7/19 7/22 7/25 8/1 8/17 9/1 23/6 23/13 24/8 29/16 29/24 37/8 37/9 39/7 39/10 39/15 39/20 40/25 41/8 41/22 42/2
proposals [2]  21/11
21/13
proposed [4]  11/11 11/12 11/19 33/7
proposition [1] 35/15
proscribed [1] 32/16
protectable [17] 8/4 27/9 28/9 28/12 28/17 28/19 28/24 29/4 29/6 29/7 31/1 31/2 32/1 32/2 32/4 32/7 32/11
protected [1]  30/20
protection [6]  25/2 25/16 26/12 36/11 40/9 40/10
protections [1] 39/25
protestations [1] 33/21
provide [1]  25/7
provided [4]  11/21 21/4 22/18 29/20
pulled [1]  28/15
pulling [1]  28/3
purposes [9]  5/12 5/24 7/4 23/15 36/16 37/2 39/22 41/2 41/23
put [9]  20/9 21/1 22/17 24/21 25/8

**P**

put... [4]  33/16 38/5 38/6 38/12

puts [1]  7/12

putting [4]  21/16 25/18 25/21 27/16

**Q**

qualified [1]  32/9

question [18]  4/15 6/12 7/23 7/23 8/13 8/13 8/16 13/23 23/4 24/7 24/11 24/16 27/20 35/8 35/11 36/23 36/25 39/22

questions [2]  36/24 42/4

quite [2]  13/9 35/7

**R**

raised [1]  29/25

rather [3]  19/18 26/4 34/1

read [3]  40/13 40/21 40/23

readily [2]  23/8 26/8

reading [1]  40/19

really [15]  9/5 19/15 21/16 24/21 25/24 26/7 27/8 27/13 29/2 33/4

33/13 34/19 34/20 34/20 36/12

reason [2]  32/21 32/24

reasonable [1]  34/18

reasons [4]  9/14 39/8 39/13 40/8

receive [1]  29/7

recess [1]  38/14

recited [1]  25/2

recognize [1]  42/4

recognized [3]  9/25 12/24 14/22

record [4]  4/8 32/23 33/16 43/5

recording [1]  4/5

redrafting [1] 14/13

reduced [1]  30/23

reexamine [1] 35/22

refer [3]  5/17 13/20 13/21

reference [2]  20/21 40/14

referenced [1]  6/16

referred [4]  10/5 13/7 14/16 15/16

referring [4]  13/3 16/25 21/2 29/22

refers [4]  13/10

13/22 14/1 40/19

reform [2]  9/8 17/12

reformation [1] 16/23

refused [1]  11/13

regard [4]  24/13 33/14 40/4 40/14

regards [1]  13/24

registered [1]  22/7

registrations [1] 21/24

Reid [1]  24/23

reject [1]  42/3

rejected [1]  11/13

rejecting [1]  11/16

related [2]  24/19 27/3

relating [1]  20/4

relationship [2] 7/11 13/3

relatively [1]  36/23

relevant [5]  5/8 23/18 23/20 23/24 24/1

relied [1]  27/1

relying [1]  16/4

Rentmeester [8] 25/25 28/2 28/8 31/20 31/23 32/22 33/2 41/24

repeat [1]  39/4

**R**

reply [2]  25/13 29/12

reporter [3]  2/21 4/5 43/11

represent [1]  39/24

representations [2]  16/9 16/16

representatives [7]  12/8 12/14 12/14 12/22 12/24 15/14 15/18

require [2]  4/12 31/10

reserved [1]  31/6

resolving [1]  8/9

respect [5]  17/1 17/15 30/9 30/17 32/14

respectfully [3]  10/10 15/8 16/3

respond [2]  30/1 32/20

response [4]  5/6 20/1 20/10 20/25

restrictive [1]  34/4

result [2]  7/6 27/16

reviewed [1]  11/22

right [23]  5/5 5/7 11/13 12/19 12/20 12/25 14/25 19/5 19/20 19/21 22/1 23/14 23/21 24/5 28/21 28/22 30/4 31/22 32/18 36/3 38/4 40/9 41/14

rights [2]  15/17 23/13

rise [1]  30/13

Rives [2]  2/16 3/20

RMR [2]  2/21 43/10

roll [1]  3/5

Room [1]  2/22

rough [1]  22/9

rule [16]  9/10 16/1 16/8 16/13 16/23 17/11 17/15 17/21 23/17 24/24 33/17 34/3 34/3 34/9 34/11 35/4

ruled [1]  32/4

ruling [1]  9/23

rulings [4]  4/20 5/21 9/16 42/7

run [3]  9/9 9/16 36/22

runs [1]  6/10

**S**

S-c-h-e-c-t-e-r [1]  4/1

S.W [3]  2/9 2/17 2/22

said [5]  9/19 19/8 32/25 33/21 33/24

same [12]  4/13 6/8 7/20 14/5 25/19 25/25 26/20 29/4 30/12 33/20 36/16 36/20

saw [1]  33/18

say [14]  5/24 6/12 6/23 9/5 12/22 15/6 20/22 24/17 29/17 31/17 33/5 37/22 37/23 41/13

saying [7]  14/23 28/23 32/10 34/17 34/20 34/21 34/21

says [5]  12/22 22/13 24/24 26/21 34/22

Schecter [2]  2/19 3/22

scope [2]  26/11 36/11

score [2]  10/19 40/17

second [3]  7/7 26/16 27/9

see [8]  9/7 21/15 24/22 26/24 34/17 34/21 35/22 41/8

seeing [2]  28/5 28/5

seek [1]  40/9

seeks [1]  22/1

seminal [1]  9/23

**S**

send [2] 32/12 42/6
sense [2] 37/19 40/23
sent [1] 21/22
separate [10] 7/18 7/18 8/1 8/9 25/16 26/10 26/12 36/11 36/24 39/21
separately [1] 37/23
set [2] 4/2 4/13
several [2] 9/1 21/11
shape [1] 5/11
shared [1] 6/4
Shields [2] 2/5 3/13
should [10] 8/18 11/18 12/4 20/5 24/15 24/17 25/11 25/16 26/11 41/19
shouldn't [1] 39/9
show [2] 22/4 34/14
showing [1] 41/17
Shumway [3] 2/21 43/9 43/10
signature [2] 43/7 43/7
signed [1] 21/21
significant [1] 19/9
significantly [2] 37/11 40/6

signing [1] 43/4
similar [6] 8/4 9/14 19/12 28/7 28/16 32/2
similarities [6] 8/6 8/15 19/3 31/2 31/4 32/16
similarity [11] 26/2 26/7 27/18 27/22 31/16 31/22 32/15 33/8 33/12 41/9 41/16
similarly [1] 6/17
simple [3] 14/16 36/23 41/1
simply [8] 7/16 10/11 19/23 29/20 37/16 37/19 40/2 42/1
since [3] 5/20 32/23 40/5
single [1] 29/8
sitting [2] 13/16 35/24
situation [4] 17/3 17/7 17/22 31/24
sketch [64]
sketches [1] 21/4
skill [1] 4/12
slightly [1] 25/12
Smith [1] 26/3
so [45]

so-called [1] 21/14
Sobhani [1] 26/5
some [11] 5/12 8/14 9/7 22/20 24/8 35/16 39/4 39/12 40/16 41/1 41/20
somehow [4] 27/14 34/25 37/9 41/9
someone [2] 4/16 5/4
something [16] 7/1 10/21 13/3 13/19 17/23 17/24 18/3 18/5 18/11 18/14 18/15 19/12 26/6 39/24 40/2 41/6
sometime [2] 19/17 22/10
sorry [1] 36/9
sort [9] 4/12 4/15 17/11 17/14 31/14 31/19 36/23 37/14 41/12
SOS [1] 25/3
sought [1] 40/10
sounds [1] 5/4
source [1] 30/10
speak [3] 4/7 24/2 32/19
speaking [3] 4/6 27/3 28/1
specific [2] 10/3

## S

specific... [1] 29/19
specifically [10] 6/16 11/2 12/2 12/6 13/12 13/15 13/20 15/6 21/13 29/21
spell [1] 3/25
sponsors [1] 11/5
sponsorship [1] 6/2
spreading [1] 39/7
spring [1] 21/11
stage [5] 6/15 6/17 8/23 14/10 27/20
staking [1] 41/4
start [6] 4/18 9/17 20/4 35/14 36/24 39/4
starters [1] 6/21
starting [1] 4/25
state [2] 9/8 40/1
stated [2] 10/11 30/18
STATES [3] 1/1 1/17 2/22
status [1] 29/7
Stein [6] 2/4 3/9 29/15 29/23 30/7 32/25
step [1] 24/15
still [3] 22/24 25/22 31/18
Stoel [2] 2/16 3/20

struggling [1] 13/24
stylized [1] 22/14
submitted [1] 21/10
subsequent [1] 18/8
substantial [12] 26/1 26/7 27/18 27/22 31/16 31/22 32/14 33/8 33/12 39/11 41/9 41/16
substantially [2] 28/7 28/16
such [5] 8/14 14/4 23/25 39/17 40/11
sued [1] 27/5
sufficiently [1] 27/8
suggesting [2] 17/5 19/10
suggests [2] 8/3 8/16
suitable [1] 6/15
Suite [2] 2/9 2/17
Sullivan [3] 2/5 3/14 30/8
summer [1] 21/12
support [1] 35/2
supposed [1] 20/20
Supreme [1] 24/24
sure [8] 12/18 13/1 13/2 13/5 24/12 31/9 32/22 41/25
surrounding [1] 34/13
systems [1] 4/15

## T

table [1] 42/4
take [7] 4/17 4/23 17/6 17/8 24/15 30/19 36/22
taken [3] 38/1 38/14 41/24
takes [1] 18/17
talk [1] 25/10
talking [1] 26/10
Tamar [3] 2/12 3/15 20/2
tangible [4] 24/22 25/1 25/9 30/23
task [1] 8/22
team [10] 6/5 6/25 7/2 14/6 18/11 19/11 19/13 19/18 37/12 37/13
technical [1] 29/16
telephone [3] 1/14 4/3 4/11
telephonic [3] 5/1 5/13 24/3
tell [3] 13/15 13/15 37/1
ten [3] 38/7 38/8 38/12
tentative [7] 4/19 4/20 4/23 8/21 9/16

**T**

tentative... [2]  9/23
19/8
tentatives [1]  9/11
term [5]  5/19 16/21
16/22 21/19 21/22
terms [9]  6/20
12/19 14/21 15/22
17/13 25/23 33/17
34/1 34/18
test [21]  24/11
25/24 25/25 26/6
26/7 26/14 28/3
29/23 30/17 30/25
31/4 31/6 31/16
32/8 32/17 33/11
35/9 35/11 36/5
36/11 41/9
than [8]  13/3 19/18
24/20 25/7 25/12
28/8 34/4 39/10
thank [16]  4/10 5/7
9/20 13/6 19/25
20/2 29/11 30/2
32/18 35/5 38/4
38/11 38/13 38/23
42/10 42/11
that [337]
that's [34]  7/23
8/11 8/13 11/1 12/6
12/11 13/23 14/16
14/25 15/3 16/19
17/14 18/5 18/15
18/20 18/20 19/6
19/14 22/1 25/2
26/13 26/16 28/16
31/8 31/23 32/5
32/8 32/12 33/7
34/2 35/20 36/4
40/7 41/1
their [2]  22/7 26/24
them [2]  39/12
39/12
themselves [1]
30/20
then [32]  4/17 4/20
4/21 4/21 7/2 7/4
7/17 7/23 8/11 8/24
9/11 11/17 14/1
16/12 16/23 18/14
18/16 18/22 19/12
21/9 24/9 27/10
31/5 31/15 31/17
35/9 35/21 36/17
37/14 38/14 40/3
40/6
there [53]
there's [8]  7/21
24/12 32/15 33/15
37/16 39/6 41/11
42/1
thereafter [3]  12/5
14/2 17/25
therefore [7]  8/5
9/13 16/22 19/15
31/21 36/20 40/18
these [9]  4/5 8/6
11/25 16/10 16/21
16/24 33/10 35/1
38/24
they [12]  4/19 6/5
7/20 12/9 17/25
18/1 22/24 35/2
35/3 37/23 40/21
41/4
they're [1]  33/25
thing [5]  7/20 14/5
29/17 31/11 33/20
things [1]  37/8
think [39]  6/20
8/21 8/24 10/8 11/1
13/16 15/8 15/9
16/3 16/7 16/14
17/1 17/2 17/5 17/9
17/15 17/16 17/18
17/20 17/20 20/24
24/14 24/15 27/19
27/21 28/7 28/9
28/12 28/14 30/10
32/21 35/20 35/21
36/4 36/10 36/11
36/23 37/14 41/23
thinking [1]  19/15
Third [1]  2/22
this [59]
those [21]  7/16 8/23

**T**

those... [19]  9/11 13/19 15/17 20/12 21/7 21/13 22/3 22/24 23/18 24/3 25/17 27/7 27/11 28/14 28/15 29/7 31/1 33/8 42/6

though [4]  5/23 9/17 31/3 41/1

thoughts [4]  4/19 4/21 4/24 9/11

three [3]  11/7 13/19 34/11

threshold [2]  28/19 39/22

through [9]  6/10 10/9 11/15 13/11 16/24 30/12 31/12 39/17 40/18

throughout [2]  39/6 39/14

time [5]  4/2 15/13 16/6 21/22 22/21

timetable [1]  40/16

today [8]  5/9 8/14 22/22 35/24 38/25 41/4 41/23 42/5

today's [1]  5/24

together [1]  6/5

told [2]  14/23 23/12

touch [1]  25/13

traced [1]  22/13

transcript [3]  1/15 43/5 43/6

transfer [3]  15/17 34/24 35/18

transferred [1]  9/22

translates [1]  25/1

tries [1]  4/16

trivial [8]  10/24 26/22 36/2 36/8 36/19 37/14 37/20 39/24

true [6]  8/24 10/10 10/21 22/23 23/16 38/1

trust [1]  32/21

try [2]  4/13 19/6

trying [4]  33/20 33/24 33/25 35/2

turn [1]  20/1

two [24]  5/17 5/21 6/21 6/22 7/16 7/25 8/9 15/10 20/11 21/16 25/5 25/17 25/20 26/8 26/14 33/8 36/15 36/20 37/23 39/15 39/20 39/21 41/7 41/21

two-part [1]  26/14

twofold [1]  36/9

type [1]  30/13

types [1]  11/12

typically [1]  26/17

**U**

U.S [1]  24/23

ultimate [1]  10/25

ultimately [3]  19/2 19/4 19/13

unambiguous [6] 16/20 16/22 17/2 17/3 17/17 33/22

unauthorized [2] 25/24 27/16

under [20]  7/13 7/13 9/14 9/24 10/2 11/16 15/22 25/16 26/2 28/20 29/10 31/4 31/6 33/11 34/4 34/5 35/3 35/12 36/11 41/24

underlying [3] 26/12 26/20 27/4

undermine [1] 33/22

understand [3] 14/23 17/17 37/1

understanding [2] 17/7 18/1

understandings [1] 16/17

understood [1] 32/19

unique [9]  10/13

**U**

unique... [8]  10/14 11/4 11/6 11/8 11/11 18/23 18/23 21/7

UNITED [3]  1/1 1/17 2/22

unless [2]  4/17 37/9

unprotectable [4]  28/3 28/14 28/15 29/6

until [1]  11/3

unusual [1]  11/6

up [6]  5/14 6/6 7/2 19/18 31/12 35/5

upon [3]  21/14 25/13 27/1

us [2]  5/4 11/2

use [22]  5/19 7/16 8/12 8/12 10/7 11/19 12/2 12/3 12/7 12/19 13/9 13/18 13/21 14/15 15/6 15/22 15/23 16/8 18/8 18/23 20/15 41/6

used [11]  11/20 12/4 12/10 12/12 15/3 15/4 17/12 18/2 18/2 22/6 25/25

uses [1]  21/13

**V**

variety [2]  39/8 40/8

vehemently [1]  41/3

vernacular [2]  20/15 21/16

versions [1]  22/14

versus [2]  4/4 31/10

very [19]  6/13 19/12 19/25 21/15 22/12 23/1 24/19 25/17 26/16 26/17 28/20 29/11 30/8 31/24 32/18 35/21 38/1 38/4 42/6

victory [1]  20/23

view [6]  8/15 8/21 18/15 20/7 22/3 39/9

views [1]  19/8

violence [1]  24/23

virtually [1]  33/9

**W**

waiver [3]  17/9 23/25 24/2

walked [1]  35/7

want [10]  6/20 9/18 19/6 20/4 27/21 29/17 32/20 33/16 34/7 35/21

wanted [3]  3/21 11/20 33/13

wants [2]  26/18 27/14

Warren [2]  33/18 34/8

was [57]

wasn't [3]  10/11 17/23 27/9

way [12]  6/14 10/21 18/8 18/24 24/8 28/25 28/25 29/1 29/4 37/6 40/1 40/23

ways [5]  9/2 33/1 33/2 33/6 39/24

we [35]  3/21 4/5 4/6 5/4 10/8 13/9 13/20 13/21 15/5 15/6 20/5 20/6 20/12 21/15 23/16 24/2 24/15 24/22 25/5 25/10 25/13 26/3 26/13 26/24 27/17 27/24 30/14 30/19 32/9 33/18 34/2 34/17 34/21 36/15 38/20

we'd [2]  37/15 40/3

we'll [1]  4/21

we're [7]  25/4 26/10 27/13 30/9

**W**

we're... [3] 30/15 31/12 36/12
We've [2] 30/11 35/7
Weeknd [1] 26/3
well [18] 3/10 3/20 3/23 6/23 9/25 12/5 12/12 12/13 14/12 14/20 16/9 16/14 16/19 18/20 23/3 26/4 26/5 41/24
well-crafted [1] 9/25
went [2] 18/2 31/25
were [19] 11/23 12/1 15/21 18/25 21/4 22/21 22/22 27/25 29/24 30/13 31/15 31/24 31/25 33/1 33/23 34/23 34/24 37/14 40/2
what [85]
what's [6] 7/24 18/19 20/22 24/11 28/5 28/6
whatever [3] 14/4 18/12 23/13
when [21] 9/22 11/10 11/25 12/7 13/7 13/8 13/17 13/20 15/1 15/5

17/25 18/1 18/22 25/10 30/25 33/14 34/19 34/22 36/10 37/24 37/25
where [10] 4/22 17/3 20/5 21/15 22/13 24/23 26/13 26/18 29/1 41/21
whether [21] 7/17 7/20 7/21 7/24 7/25 9/23 13/18 13/18 15/9 16/18 19/2 23/5 24/7 25/10 25/15 26/6 26/11 28/6 36/6 36/13 41/8
which [31] 6/3 6/25 7/3 7/14 7/15 10/4 10/9 11/13 14/22 15/11 21/15 21/21 26/25 28/4 29/3 30/20 31/6 31/25 32/3 32/7 32/25 33/3 33/19 34/8 34/12 37/6 40/8 40/9 40/10 40/20 42/3
while [4] 21/25 30/17 33/4 34/16
who [7] 3/6 6/10 24/21 24/25 24/25 35/8 35/12

whoever [1] 4/16
why [5] 11/2 24/3 27/19 27/21 39/8
will [6] 4/13 5/23 6/12 6/22 37/23 41/13
willing [1] 25/4
willingness [1] 4/10
wins [2] 41/14 41/16
wish [2] 29/12 32/19
within [5] 10/5 23/8 36/7 37/10 40/7
without [2] 41/19 43/6
won [1] 32/22
won't [2] 4/16 38/8
Worcester [2] 2/5 3/14
words [3] 21/13 21/24 41/15
work [25] 11/9 21/25 24/21 24/25 25/9 25/11 25/14 25/16 25/25 26/6 26/11 26/12 26/13 26/18 26/20 26/24 27/10 27/16 28/19 30/9 30/14 30/15 31/14 36/10 41/18
worked [1] 11/22

# W

works [8]  10/17
18/14 24/13 24/18
26/19 33/23 34/23
37/23
Worldwide [1]
33/19
worn [1]  22/15
worth [2]  6/17 9/5
would [34]  7/6 7/14
7/15 10/8 11/4
11/20 12/8 12/10
15/19 15/19 15/22
15/23 16/20 17/11
18/5 18/8 22/24
25/22 27/17 28/1
28/22 29/8 29/23
30/13 31/21 33/8
33/10 35/23 36/1
36/5 36/17 36/18
39/23 39/23
wouldn't [4]  16/23
17/20 24/3 35/18
written [4]  6/13 9/8
16/22 42/6
wrong [2]  17/13
18/19

# Y

years [4]  5/10 11/7
13/20 26/8
yes [6]  23/23 29/14
32/15 32/20 35/24
36/4
yet [2]  5/22 34/17
York [2]  2/6 2/14
you [81]
You'll [1]  30/2
you're [8]  12/20
14/21 16/2 16/24
19/10 31/1 32/10
40/20
you've [1]  27/23
your [74]
yourself [1]  4/7